**C & L CONSTRUCTION CO.**

v.

**The UNITED STATES.**

**No. 479–81C.**

United States Claims Court.

Dec. 4, 1984.

As Corrected Jan. 8, 1985.

---

Frank V. Bonzagni, Boston, Mass., for plaintiff; Leonard Petkoff, Washington, D.C., of counsel.

Richard F. Silber, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

LYDON, Judge.

This construction contract case comes before the court on motions for summary judgment, both parties claiming there are no material issues of fact in dispute and that they are entitled to judgment as a matter of law. On the other hand, each party opposes the summary judgment motion of the other party on the ground that the existence of genuine material issues of fact precludes the granting of said motion. The question for consideration in this case is whether plaintiff, who had performed a housing construction contract for the United States Air Force, is entitled to reformation of said contract on the ground of mistake in the proposal (bid) it submitted in response to an Air Force Request For Proposal (RFP). After careful consideration of the submissions of the parties, and following oral argument, the court concludes that defendant's motion for summary judgment should be granted.

### Facts

On June 20, 1975, Pease Air Force Base in New Hampshire (PAFB) issued a RFP for the design and construction (Turnkey) of 100 military family housing units. As to turnkey construction contracts generally see *Mobile Housing Environments v. Barton & Barton,* 432 F.Supp. 1343, 1346 (D.Col.1977). The RFP allowed a contractor responding to the RFP to propose its own housing design, site layout and quality level for the procurement project, with each proposer to be fully responsible for quality control and any deficiencies in design or workmanship. The RFP specifically stated that the total funds allocated for this contract were $2,728,500.

The RFP contained a Price Proposal Schedule which was to be completed by the offerors or proposers. The Schedule called for the submission of a Lump Sum price for the complete design and construction of 100 family housing units, with this Basic Lump Sum price to be broken down to reflect the Lump Sum price for work "Inside building 5' line" and for work "Outside building 5' line." This Schedule also provided that the Basic Lump Sum price could be increased or decreased by amounts applicable to four work items for the addition to or deletion from the Basic Lump Sum price. The four work items listed in the Schedule were Landscaping, Carports, Garages, and PFL Prefinished, Hardboard Siding. The submission of prices for these four items was mandatory for all proposals. The Schedule advised that it was intended that the basic proposal submitted by any offeror would meet or exceed the minimum requirements of the RFP and would permit an award at or below the programmed funds of $2,728,500.

The RFP contained an "Information To Proposers" section. Paragraph 21 of this section provided as follows:

STATUTORY COST LIMITATIONS In accordance with *applicable* Public Laws, a program cost average for all Air Force family housing units in the continental United States and overseas has been established. The Air Force has distributed these funds for each project in the Fiscal Year 1975 Program, and has programmed $2,728,500 for award of this contract. This sum represents the total contract funds presently available for this project.

PROPOSALS IN EXCESS OF THIS AMOUNT, AT THE GOVERNMENT'S DISCRETION, MAY BE ELIMINATED FROM FURTHER CONSIDERATION.

READ THE FOLLOWING IN CONJUNCTION WITH THE INSTRUCTION TO BIDDERS, SF 22

The Air Force considers this amount adequate for the procurement of this project in accordance with this Statement of Work. Therefore, proposers are encouraged to prepare their proposals so as to comply with all minimum RFP requirements and to permit award at a price

within this amount. Desirable features exceeding minimum requirements, if not included in basic proposal, may be submitted as separately-priced items and will be considered in proposal evaluation. (underscoring supplied)

On October 29, 1975, six proposals were submitted to the Air Force in response to the June 20, 1975, RFP. As finalized, the proposals set forth the following Basic Lump Sum prices:

a) Proposer No. 67—$3,300,000

b) Proposer No. 59—$3,218,000

c) Proposer No. 49—$3,210,000

d) Proposer No. 46—$2,931,000

e) Proposer No. 71—$2,910,000 [1]

f) Proposer No. 58—$2,840,000

It is to be noted that all proposers submitted Basic Lump Sum prices in excess of the amount allocated and programmed for this contract, *i.e.*, $2,728,500.

After receipt of these proposals, the contracting officer at PAFB determined that the six proposals were in the competitive price range for further consideration. The applicable regulation governing this determination (AFR 70–15(5)(n)(2) (1973)) stressed that the concept "competitive range" was to be viewed broadly, with the object being "not to eliminate proposals from the competitive range" but "to enhance proposal acceptability from which award may be made in the Government's best interest * * *." Any doubt in this regard must, under the regulation, be resolved by considering the doubtful proposal as being within the competitive range. Since this was to be a negotiated procurement, it was hopefully anticipated that through negotiation a proposal would be proffered that would be within the funding limits for this contract.

After deleting the price Schedules and all references to company names, each proposer was given a number, and each Basic Proposal was forwarded to the Strategic Air Command Source Selection Evaluation Board (SSEB) at Offutt Air Force Base (OAFB) in Nebraska for detailed technical evaluation of each Basic Proposal and assignment of ratings for each evaluation element as described in the RFP. The technical evaluation of each proposal at the OAFB was conducted independently of the contracting officer at PAFB. The SSEB was composed of military and government civilian personnel who represented various functional and technical disciplines in housing procurement.

After the SSEB completed its evaluation and assigned technical quality ratings, the SSEB gave its findings to the Source Selection Advisory Council (SSAC). The SSAC is comprised of senior military and/or government civilian personnel designated to serve as advisors to the Source Selection Authority (SSA), who is the major command commander directing the source selection process. The SSAC assessed each proposal's strengths and weaknesses and prepared an Analysis Report for the SSA. Most significantly, the SSAC introduced for the first time price factors into the analysis. The SSAC then determined a relative value for each proposal. This was done by dividing the proposed price of each proposal by the quality rating to arrive at a dollar per quality point figure. The SSAC then prepared a final ranking of the proposals to present to the SSA for a final determination.

The SSA in this case was Major General Thomas M. Ryan, Jr. In addition to directing the source selection process, the SSA must ultimately select the proposal which based on the facts and findings will be in the best interest of the Air Force. In this case the SSA issued his decision on February 27, 1976, to the contracting officer at PAFB to award the contract to plaintiff.

During this evaluation process the contracting officer at PAFB began negotiating with each offeror including plaintiff. These negotiations were designed to resolve any technical deficiencies and to

---

1. Numbers were used to identify each offeror. Plaintiff was identified as Proposer No. 58. Proposer No. 71's initial Basic Lump Sum price of $2,728,500 was subsequently raised to $2,910,000.

bring the proposal within the target amount of $2,728,500. The submissions received by the court evidence thorough negotiations between plaintiff and the Air Force commencing in November 1975. Extensive correspondence between plaintiff and the government took place relative to this process.

On February 6, 1976, plaintiff initially confirmed its proposal of $2,728,350. Defendant in a letter dated February 11, 1976, informed plaintiff that negotiations would conclude on February 19, 1976, and plaintiff's proposal would be considered final unless it chose to make additional changes in writing. This same confirmation letter was sent to all remaining offerors. On February 18, 1976, plaintiff confirmed by letter that its best offer was $2,728,350. The award of the contract to plaintiff followed on February 27, 1976.

After the award of the contract, plaintiff commenced performance and substantially completed the contract in August of 1977. On May 30, 1978, over two years after the contract was awarded and almost one year after completion, plaintiff submitted a claim of mistake in proposal to the General Accounting Office (GAO). Plaintiff withdrew this claim before the GAO, and on May 21, 1980, plaintiff submitted a new claim under the Contract Disputes Act of 1978 to the contracting officer at PAFB. Plaintiff sought reformation of the contract at issue. On May 11, 1981, the contracting officer issued his final decision denying plaintiff any relief.

Plaintiff subsequently filed this suit in this court on August 3, 1981, requesting reformation on several grounds. Defendant in its answer to plaintiff's complaint filed a counterclaim, amount unspecified, in which defendant alleged, in very general terms, that plaintiff failed to adequately perform the contract here in question by tendering to defendant defective family housing units and by failing to perform required quality control inspection, all of which, defendant alleged, damaged defendant in an amount to be determined in subsequent proceedings. Defendant's summary judgment motion does not embrace its counterclaim.

In order to place the arguments of the parties in proper perspective, it is important to keep in mind the following facts. At the time the RFP was issued, Title V of the Military Construction Authorization Act of 1975, Pub.L. No. 93–552, 88 Stat. 1757, authorized the Secretary of Defense to construct family housing at military installations throughout the United States and overseas. Section 502(b) of the Act, *supra*, established the maximum average cost limitations for that construction as follows:

> The average unit cost for all units of family housing constructed in the United States (other than Alaska and Hawaii) shall not exceed $30,000 and in no event shall the cost of any unit exceed $46,000.

Although $30,000 was the maximum average cost per unit, this cost also included many additional items as set out in Section 502(a), such as household appliances, (ranges, refrigerators), equipment, fixtures, land acquisition and site preparation.

The RFP for the 100 military housing units at PAFB did not require the contractor to include all of the items provided for in Section 502(a). Accordingly, $195,000 was deleted from the initial Air Force allocation of $2,923,500 for the construction of the 100 military housing units at PAFB, thus allowing $2,728,500 for said construction. It is to be noted that the initial allocation of $2,923,500 was below the maximum average unit cost of $30,000, which for 100 units would total $3,000,000.

Title V of the Military Construction Act[i] of 1976, Pub.L. No. 94–107, 89 Stat. 546, 560, effective October 7, 1975, provided in Section 502 as follows:

> (b) The average unit cost for all units of family housing constructed in the United States (other than Alaska and Hawaii) shall not exceed $35,000 and in no event shall the cost of any unit exceed $51,000.

\*    \*    \*    \*    \*    \*

(d) Notwithstanding the limitations contained in prior Military Construction Authorization Acts on cost of construction of family housing, the limitations on such cost contained in this section shall apply to all prior authorizations for construction of family housing not heretofore repealed and for which construction contracts have not been executed prior to the date of enactment of this Act.

As indicated above, the statutory maximum average cost that the Air Force could spend for a housing unit at the time the RFP was issued was $30,000 per unit. Thus, 100 housing units set forth in the RFP had a statutory cost limitation of $3,000,000. The Air Force allocated $2,728,500, which was under the $3 million statutory cost ceiling, to the PAFB contract, and the RFP stated this was the Air Force cost limitation for construction of the 100 housing units. The RFP requested a proposal from plaintiff and others to design and construct 100 housing units within the limitation of $2,728,500. On October 7, 1975, while plaintiff and the Air Force were negotiating relative to the above RFP, Congress increased the maximum average cost ceiling for a housing unit from $30,000 per unit to $35,000 per unit. Plaintiff claims that its proposal in response to the RFP contained mistakes in the amount of $511,-360 and that the limitation in the RFP of $2,728,500 should not bar recovery of the amounts of said mistakes because the Air Force, at the time of award, had statutory authority and a concomitant obligation and duty to increase the RFP cost limitation from $2,728,500 to $3,500,000. If this was done, plaintiff's recovery of $511,360 reflecting its mistakes in bid would not be barred by any cost limitation provision in the contract.

### A. *Mutual Mistake—Misrepresentation*

Plaintiff contends that the defendant's failure to amend the RFP when the limitation on costs per housing unit were changed by Congress on October 7, 1975, and plaintiff's ignorance of said amendment, constitutes a mutual mistake of fact or law and warrants reformation of the contract in question. Alternatively, plaintiff claims that defendant misrepresented the cost limitation situation and this wrong justifies reformation of the contract.

A claim of a mutual mistake of fact based on the unawareness of the parties to a change in the law generally will not support reformation. This is so because of the rule of law that "everyone is charged with the knowledge of the United States Statutes at Large * * *." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). Charged with this knowledge, plaintiff may not properly rely on its ignorance in asserting mutual mistake of fact as a basis for reformation.

Reformation of the contract in issue based on mutual mistake of law must also be rejected. The court recognizes that, in some instances, mutual mistake of law may be a basis for reformation, especially when affirmative government action is involved. *See* C. Hagberg, *Mistake in Bid, Including New Procedures Under Contract Disputes Act of 1978*, 13 *Pub. Cont.L.J.*, 257, 299–300 (1983). However, the two cases, relied on by plaintiff, which support plaintiff's position in this regard, are distinguishable. *See Blackhawk Hotels Co.*, ASBCA No. 13333, 68–2 BCA ¶ 7265 *overruled on other grounds, National Line Co.*, ASBCA No. 18739, 75–2 BCA ¶ 11,400; Comp.Gen. B–180071, February 25, 1974, 74–1 CPD ¶ 101. Both of these cases deal with a situation in which the government affirmatively stated that a law which would increase the contractor's costs, if applicable, did not apply. Subsequently, it was determined that these assurances were incorrect and the contractors' costs did increase as a result. In those cases the plaintiffs were allowed to reform their respective contracts based on mutual mistake of law.

In this case, the government sent out its RFP with a stated limitation of $2,728,500. This figure was influenced by limitations ($3,000,000) established by Congress. *See* Pub.L. No. 93–552, *supra*. The RFP was a turnkey procurement which imposed upon

the offeror the responsibility, beyond minimum requirements, of designing the unit and submitting a total cost bid. The proposals were received by the Air Force in October 29, 1975. All offerors prepared their bids with the stated cost limitation in front of them. The Air Force subsequently negotiated with the offerors, including plaintiff, and plaintiff determined it could do the job for less than the cost limitation. After the requisite evaluations and above negotiations, plaintiff confirmed its proposal and the contract was awarded on February 27, 1976.

It is true that prior to the date upon which the proposals were to be received, Congress amended the limitations on the cost of military housing from an average unit cost of $30,000 to $35,000. *See* Pub.L. No. 94–107, *supra.* This would permit an increase in the limitation set by the Air Force. However, the plaintiff determined that it could do the job for less than $2,728,500 and the government accepted its proposal. In this case, unlike the two cases cited above, there were no statutory changes or affirmations by the government, subsequently proven inaccurate, which increased plaintiff's costs. Plaintiff simply underbid or underestimated (petition, par. seventeenth) the project and now wishes to reform the contract based on a change in the maximum average limits on the unit cost of housing which occurred prior to the defendant's acceptance of plaintiff's bid.

Having distinguished the cases which support reformation of a contract based on mutual mistake of law, the court is persuaded that no such reformation should be allowed. In support of this disallowance it can be said that it is generally true that relief for mutual mistake of law is rare. *See* C. Hagberg, *Mistake in Bid, Including New Procedures Under Contract Disputes Act of 1978*, 13 *Pub.Cont.L.J.* 257, 299 (1983). The legal basis of this general rule is that "both parties are generally held to have knowledge of the laws and regulations affecting their business dealings." *Id. See also Federal Crop Ins. Corp. v. Merrill, supra*, 332 U.S. at 384–85, 68 S.Ct.

at 3. Therefore, the court rejects reformation based on mutual mistake of law or fact.

Closely linked to plaintiff's claim for reformation based on mutual mistake of law or fact is a claim for reformation based on misrepresentation by defendant. Defendant did state in its RFP that the "Statutory Cost Limitation" based on applicable public laws upon which the Air Force programmed its funding for PAFB was $2,728,500. This statement was a correct statement. Plaintiff contends that defendant's failure to amend the RFP to reflect the October 7, 1975, increase in the statutory ceiling from $3 million to $3.5 million constitutes misrepresentation entitling plaintiff to reformation of the contract. It is noted that even after the statutory increase, the RFP was still based on applicable public laws since it was below the statutory ceilings set by Pub.L. No. 94–107, *supra.*

In considering the claim of misrepresentation the two cases cited above regarding mutual mistake are also relied on by plaintiff. *See Blackhawk Hotels Co., supra;* Comp.Gen. B–180071, *supra.* Both cases do allow reformation based in part upon misrepresentations by the government, but both are again factually distinguishable. Further, there is authority holding that misrepresentations regarding matters of law cannot provide a reason for disturbing a contract. *See Fidelity & Casualty Co. of N.Y. v. United States*, 203 Ct.Cl. 486, 496 n. 8, 490 F.2d 960, 965 n. 8 (1974); *Mills v. United States*, 187 Ct.Cl. 696, 700, 410 F.2d 1255, 1257–58 (1969).

In *Mills v. United States*, the plaintiff, an elderly, uneducated widow, entered negotiations with the government for the sale of her land which included a commercial gravel pit. Plaintiff alleged that the government misstated the law when it represented that the plaintiff could not be compensated for the gravel pit. The court found that most of the evidence concerning this misrepresentation constituted inadmissible evidence but added:

Even if plaintiffs could show misrepresentation of law, we could not grant the relief requested. In absence of unusual circumstances, representations as to questions of law form no basis for setting aside a contract. *Mills v. United States, supra,* 187 Ct.Cl. at 700, 410 F.2d at 1257.

The court in the *Mills* case did not consider the fact that an elderly, uneducated widow negotiating with the government constituted "unusual circumstances." In fact the court imposed a duty on the plaintiff to retain counsel in that situation. It stated:

Ordinarily one having need of legal advice will retain counsel and not take it from the other side of the negotiating table. Purchase and sale of real estate is a kind of transaction where retention of counsel is ordinary and usual. The relationship of the parties was not such that it was reasonable for one side to have relied on the representations of the other. *Id.* at 700, 410 F.2d at 1258.

Clearly, in this case in which plaintiff was negotiating a multi-million dollar contract with the government it should have had legal counsel. If the court in *Mills v. United States, supra,* did not find the relationship between a widow and the government sufficient to justify reliance by the widow on the representations of the government, then a construction company should not be able to so rely. After plaintiff perceived a difficulty in meeting the contractual limit set by the government, it should have inquired into the validity of that limitation. This position parallels the rule set out in *Federal Crop Ins. Corp. v. Merrill,* that everyone is charged with knowledge of the United States Statutes at Large. *Federal Crop Ins. Corp. v. Merrill, supra,* 332 U.S. at 384–85, 68 S.Ct. at 3.

Implicit in plaintiff's allegation of misrepresentation is the imposition upon the government of a duty to disclose changes in the law. However, such a duty normally does not exist absent mandatory instructions from Congress or the President. *See Nordstrom v. United States,* 169 Ct.Cl.

632, 638, 342 F.2d 55, 59 (1965). *See also Federal Crop Ins. Corp. v. Merrill, supra,* 332 U.S. 384–85, 68 S.Ct. 1, 3; *Aflague v. United States,* 159 Ct.Cl. 80, 86–87, 309 F.2d 753, 755–56 (1962). It follows that the court must consider whether or not Pub.L. No. 94–107, *supra,* contains mandatory instructions to inform contractors of this change. The court is not convinced that section 502(d) of Pub.L. No. 94–107 so directs. Section 502(d) states:

Notwithstanding the limitations contained in prior Military Construction Authorization Acts on cost of construction of family housing, the limitations on such cost contained in this section shall apply to all prior authorizations for construction of family housing not heretofore repealed and for which construction contracts have not been executed prior to the date of enactment of this Act.

Section 502(d) states that the government shall apply the new limitations but it does not expressly direct that contractors be informed of them. It clearly does not direct that the government spend additional money on housing. It merely sets a higher *limit* within which the government may operate. Therefore, no mandatory instructions from Congress or the President existed which required the defendant to inform the plaintiff of this change.

Based on the above conclusions of law, the court finds plaintiff's reliance on *J.A. Jones Constr. Co. v. United States,* 182 Ct.Cl. 615, 390 F.2d 886 (1968) and *Helene Curtis Industries, Inc. v. United States,* 160 Ct.Cl. 437, 312 F.2d 774 (1963) to be misplaced. In *J.A. Jones,* the government awarded a construction contract to plaintiff without informing it of the immense amount of government construction that would be taking place in the area which would force plaintiff to pay premium wage rates to acquire the necessary employees. In *Helene Curtis,* the plaintiff was awarded two contracts by the government to produce a disinfectant. In awarding the contract, the government failed to disclose specific technological requirements which it knew plaintiff did not know about and

which it knew or should have known would raise plaintiff's costs.

In both cases, the Court of Claims determined that the government's failure to disclose this information resulted in increased costs to the contractors. The court decided in both cases that the plaintiffs were entitled to the losses caused by the government's failure to disclose. In this case, plaintiff contends that the government's failure to disclose the change in the statutory limitation on the cost of military housing was the same as the nondisclosure in the above cases.

The court does not agree that *Helene Curtis* and *J.A. Jones* are controlling in this case. In *Helene Curtis*, the court emphasized that the disinfectant was new and the government knew much more about it than the plaintiff. *Helene Curtis Industries, Inc. v. United States, supra*, 160 Ct.Cl. at 444, 312 F.2d at 778. After finding such superior knowledge the court stated:

> In this situation the Government, possessing vital information which it was aware the bidders needed but would not have, could not properly let them flounder on their own. Although it is not a fiduciary toward its contractors, the Government—where the balance of knowledge is clearly on its side—can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word. *Id.*

The court in *J.A. Jones* found that the government had the same superior knowledge and that it had a duty to disclose it to plaintiff *J.A. Jones Constr. Co. v. United States, supra*, 182 Ct.Cl. at 619, 390 F.2d at 888.

Such superior knowledge on the government's side cannot be found in this case. The court has already cited the rule that everyone is charged with knowledge of the United States Statutes at Large. *See Federal Crop Ins. Corp. v. Merrill, supra*, 332 U.S. at 385, 68 S.Ct. at 3. In *Helene Curtis* and *J.A. Jones*, the plaintiffs had little way of knowing about the facts which raised their costs. However, in this case

the law charges the plaintiff with such knowledge. Therefore, "defendant was not remiss in failing to warn plaintiff of what the plaintiff should already have known." *J.A. Jones Constr. Co. v. United States, supra*, 182 Ct.Cl. at 624, 390 F.2d at 891.

In addition, in both *Helene Curtis* and *J.A. Jones*, the plaintiffs incurred additional costs and thus losses as a direct result of the nondisclosures. The losses alleged to have resulted in this case are distinguishable. Plaintiff claims that had it known of the increased statutory limitation it would have negotiated differently. Plaintiff can only speculate as to whether it would have ultimately submitted the same bid, whether disclosure would have prevented its losses, or, if a higher limit had been utilized, whether it would have been awarded the contract at all. The direct relationship between the contractor's loss and the alleged nondisclosure does not exist in this case as it did in *Helene Curtis* and *J.A. Jones*.

Accordingly, the court concludes that reformation based on mutual mistake or misrepresentation regarding the legislative change in the limitations on costs of military housing is not warranted.

### B. *Unilateral Mistake*

In the alternative, assuming no cost limitation barrier to recovery, plaintiff seeks reformation based on unilateral mistake. Plaintiff claims that it made several mistakes, amounting to $511,360, in its proposal which entitles it to such equitable relief.

■ It is well settled that the equitable remedy of reformation to correct a unilateral mistake in a plaintiff's bid is available only if "the government knew or should have known of a mistake in a bid costly to the bidder." *Burnett Electronics Lab., Inc. v. United States*, 202 Ct.Cl. 463, 472, 479 F.2d 1329, 1333 (1973). *See also Carrier Corp. v. United States*, 6 Cl.Ct. 169, 173 (1984); *Aydin Corp. v. United States*, 229 Ct.Cl. 309, 669 F.2d 681 (1982); *Bromley Contracting Co. v. United States*, 227 Ct.Cl. 569, 572–73 (1981); *Chernick v. United States*, 178 Ct.Cl. 498, 506, 372 F.2d

492, 496–97 (1967). In *Ruggiero v. United States*, 190 Ct.Cl. 327, 335, 420 F.2d 709, 713 (1970) the court set out the following policy behind allowing reformation in such cases:

> * * * what we are really concerned with is the overreaching of a contractor by a contracting officer when the latter has the knowledge, actual or imputed as something he ought to know, that the bid is based on or embodies a disastrous mistake, and accepts the bid in face of that knowledge.

Consistent with this policy, the court has found no overreaching by the government in cases in which the government requests and receives adequate verification of the bid before the award of the contract. *See Alabama Shirt & Trouser Co. v. United States*, 121 Ct.Cl. 313 (1952).

It is uncontradicted in this case that no such verification was sought. After considerable negotiations between the parties, plaintiff submitted a proposal $150 less than the limit stated in the government's RFP. In order to finalize this proposal and terminate negotiations, the government requested that plaintiff gave its best and final proposal. At that time plaintiff was still free to alter its proposal but it confirmed its proposal of $2,728,350.

■ Without a request for verification the issue becomes one of whether the government knew or should have known of

mistakes made by plaintiff in its proposal. It is plaintiff's contention that if defendant had carefully followed its evaluation procedures it would have detected the errors made by the plaintiff in submitting its proposal.[2]

Given plaintiff's allegations and arguments concerning defendant's failure to comply with its own procedural rules in awarding this contract, it is apparent that plaintiff is relying on constructive, as opposed to actual, knowledge in that plaintiff is claiming that the contracting officer should have known of these mistakes. The court in *Chernick v. United States, supra,* stated the test for constructive notice in cases dealing with mistake in bids. A court, in considering all facts and circumstances of the case, is to determine whether "there were any factors which reasonably should have raised a presumption of error in the mind of the contracting officer * * *." *Chernick v. United States, supra,* 178 Ct.Cl. at 504, 372 F.2d at 496.[3]

■ In arguing that the defendant should have known of plaintiff's mistake thus entitling it to reformation, plaintiff claims that defendant should have known of a mistake due to a disparity of 40 percent between the dollar/quality value of plaintiff's proposal as compared to the average cost/quality for all the other proposals. Assuming this to be true, that fact

---

**2.** Such errors must be "clear cut clerical or arithmetic error[s], or misreading of the specifications, and * * * not * * * mistakes of judgment." *Ruggiero v. United States*, 190 Ct.Cl. 327, 335, 420 F.2d 709, 713 (1970). Though this court does not base its decision on the character of the errors made by the plaintiff, it does take note of the pleadings filed by the plaintiff in a prior case.

In *Zell v. C & L Constr. Co.*, No. 76–1947–S (D.Mass.1976), Walter A. Zell, former Vice-President of C & L Construction filed an action against the plaintiff to recover his share of C & L's Corporate profits for the fiscal years ending on March 1975 and March 1976, including any received from the PAFB contract. In its answer to Zell's complaint filed on April 15, 1976, plaintiff admitted that it had made a $300,000 error in its bid. In the same case plaintiff also submitted a counterclaim against Zell alleging that his negligence in preparing the bid for the PAFB

contract resulted in C & L suffering substantial financial loss on the contract. These admissions by plaintiff in these pleadings combined with Zell's answer to plaintiff's counterclaim stating that the choice to reduce the bid was a conscience exercise of judgment on the part of C & L's President, Mr. Robert Cruthers, indicates to the court that the alleged errors in this case may not be of the clerical nature required in *Ruggiero v. United States, supra*. However, such a determination turns on a question of fact and thus the court, in this summary judgment determination, does not base its decision on the character of the mistakes committed.

**3.** The court is in substantial agreement with the plaintiff, that in the context of a negotiated turnkey procurement involving several evaluating bodies, reference to the contracting officer incorporates the other members of the award-making procurement process as well.

alone does not constitute constructive notice where there are other factors to consider (*e.g.,* the difference between the three lowest bids was only $91,000 or 3.335 percent of the total amount allocated of $2,728,500. *See Aydin Corp. v. United States, supra,* 229 Ct.Cl. at 317, 669 F.2d at 686; *Wender Presses, Inc. v. United States,* 170 Ct.Cl. 483, 343 F.2d 961 (1965) (125 percent variance, no imputed knowledge); *Jansen v. United States,* 170 Ct.Cl. 346, 357, 344 F.2d 363, 370 (1965) (100 percent variance, no imputed knowledge); *Alabama Shirt & Trouser Co. v. United States, supra.* All of these cases adopt the principle that mere disparity between bids does not automatically lead to the conclusion that the test of constructive notice has been satisfied.

■ In asserting that the defendant should have known of a mistake committed by plaintiff by comparing its proposal with those of the other contractors, plaintiff ignores the character of the turnkey process such as was involved in this procurement.[4] The turnkey process has been described as a method in which a developer builds in accordance with plans and specifications prepared by his own architect and to a standard of good design, quality and workmanship. Necessarily, the guidance in the solicitation is limited to an indication of the features required, such as style of house, number of bedrooms and baths, etc., and an indication of where the housing is to be located on the site—essentially, performance specifications. 51 Comp.Gen. 129, 131 (1971). Under such a system, beyond the minimum specifications each proposal would be unique with its own qualities and costs. For example, in this case one proposal included solar homes. Under such a procurement method the use of comparisons of different proposals to determine if mistakes have been made becomes quite difficult in that the uniqueness of each proposal does not make them readily comparable. Therefore, at the time the proposals were evaluated there was a presumed reasonable explanation for any disparity between bids. Such a reasonable explanation negates the inference of error on the part of the plaintiff and does not, without more, give the contracting officer constructive notice of a mistake. *See Aydin Corp. v. United States, supra,* 229 Ct.Cl. at 317, 669 F.2d at 687; *Wender Presses, Inc. v. United States, supra.* The court in *Aydin Corp. v. United States, supra,* stated, in commenting on the use of a reasonable explanation to negate the inference of an error in cases of disparity between bids, in pertinent part as follows:

> This approach, we believe, strikes a balance between the dual concerns of "overreaching of a contractor by a contracting officer," *Ruggiero v. United States,* 190 Ct.Cl. at 335, 420 F.2d at 713, on the one hand, and the need to avoid making it necessary for the contracting officer "to act as a 'nursemaid' for bidders." Doke, *Mistakes in Government Contracts—Error Detection Duty of Contracting Officers,* 18 S.W.L.J. 1, 11 (1964) [229 Ct.Cl. at 317–18, 669 F.2d at 687].

In the *Aydin Corp.* case, the court cautioned: "The procurement process requires that contracting officers be most cautious about doing anything to discourage low bidders from bidding low." *Id.* at 318, 669 F.2d at 687 (citation omitted). Based on this case law and the character of negotiated turnkey procurements, the court concludes that as a matter of law the disparity between the bidders was not sufficient enough to find constructive notice on the part of the government regarding mistakes by the plaintiff in its proposal.

■ The plaintiff also makes the argument that defendant's failure to comply with its "Source Selection Plan" (SSP) precluded it from discovering plaintiff's er-

---

4. Plaintiff suggests that due to the minimum specifications required by defendant, this was not a turnkey procurement. The court cannot accept this suggestion. Those minimum requirements were designed to assure the government that certain specifications were built into the housing and also to aide the contractors in drawing up their proposals. They do not alter the turnkey nature of the procurement. *See Lincoln Services, Ltd. v. United States,* 230 Ct.Cl. 416, 678 F.2d 157 (1982).

rors. Plaintiff argues that if defendant had utilized the proper procedures it would have known of the errors committed. Plaintiff concludes that since defendant should have known of plaintiff's unilateral mistake, it is entitled to reformation.

■■■■ In support of its motion for summary judgment, and in particular, the above theory regarding defendant's failure to comply with its procedures and the constructive notice which arises therefrom, plaintiff has submitted several affidavits.[5] Assuming, for the sake of argument, the court accepts the assertions made in those affidavits, the court is not persuaded as a matter of law that the defendant's failure to completely adhere to its procedural requirements should result in attributing constructive notice to defendant resulting in reformation of the contract.

Plaintiff asserts, supported by its affidavits, that the SSP "was the primary source document established by the Air Force, to be utilized in this procurement." Plaintiff claims that defendant's failure to follow the SSP resulted in its failure to discover plaintiff's errors. What plaintiff fails to consider is that the SSP was developed "for official use only." The SSP specifically sets out its objectives:

1. The goal of the military family housing construction program is to provide, at the earliest practical beneficial occupancy date, new housing of the highest possible quality within the space and cost limitations set by the Congress, and at the most reasonable cost considering both initial investment and ultimate maintenance costs. Special emphasis shall be placed on obtaining the best practical, functional and aesthetic design for this project, both with respect to living units and site.

2. The standards and criteria used in this procurement are intended to be applied in such a way that the resultant housing units and the site development shall be comparable with respect to scope, equipment, quality and livability of the accommodations provided at other bases regardless of geographic location, method of funding or procurement.

3. The objective of this evaluation procedure is to insure that an impartial, equitable, economic—but thorough—evaluation of each competitor's proposal is accomplished so that the results of the evaluation can be properly compared and presented to the SSA in a manner which objectively allows him to select that source which provides the optimum satisfaction of the Government's stated requirements. [Source Selection Plan Part III, February 15, 1974.]

A review of these objectives clearly demonstrates that these procedures were designed for the benefit of the government. The SSP was drafted ultimately to ensure

**5.** Regarding the affidavits submitted by plaintiff, defendant has moved to strike such affidavits on the ground they do not comply with Rule 56(e). In particular defendant asserts that plaintiff's affidavits are not based on personal knowledge. RUSCC 56(e) (1984). Instead, defendant contends they are based on hearsay and contain other inadmissible matter. Additionally, defendant claims the affidavits are conclusory and argumentative in nature.

Regarding these allegations, the court concurs with defendant as to at least one of plaintiff's affidavits. In that affidavit, the Anderson affidavit, plaintiff's "expert" essentially rebuts the points made in defendant's motion for summary judgment. Such an affidavit, which is really an argumentative brief in response to defendant's motion for summary judgment, does not comply with RUSCC 56(e).

In opposition to this motion to strike, plaintiff cites authority which it claims supports use of affidavits similar to those it has submitted. Most importantly plaintiff points out that affidavits that do contain inadmissible matter need not be completely stricken. The court is free to disregard the inadmissible parts and consider the remainder of the affidavit. See United States v. Alessi, 599 F.2d 513 (2d Cir.1979); Arney v. United States, 479 F.2d 653 (9th Cir.1973); Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 579 (2d Cir.1969); Wimberly v. Clark Controller Co., 364 F.2d 225 (6th Cir.1966); 6 J. Moore, Moore's Federal Practice ¶ 56.22[1] (2d ed. 1982).

The court has reviewed the affidavits and the motion to strike them. The court concludes that given its ultimate decision based on the cross-motions for summary judgment, it is not necessary to rule on the motion to strike. Given the court's legal conclusions, complete consideration of plaintiff's affidavits does not alter the result.

that the government could acquire the best housing at the best price. Plaintiff's counsel during oral argument admitted that the regulations in question were not designed for the benefit of contractors.

It is clearly established that when rules and regulations are promulgated for the benefit of the government and no one else, the other party to a contract cannot complain if such regulations are not complied with. *See Hartford Accident & Indemnity Co. v. United States,* 130 Ct.Cl. 490, 492–94, 127 F.Supp. 565, 566–67 (1955). *See also Perkins v. Lukens Steel Co.,* 310 U.S. 113, 129, 60 S.Ct. 869, 877, 84 L.Ed. 1108 (1940).

The case most on point regarding the issue of the role of the procurement regulations is *Lincoln Services Ltd. v. United States,* 230 Ct.Cl. 416, 678 F.2d 157 (1982). In that case the Court of Claims was presented with a claim by an unsuccessful bidder for proposal preparation expenses incurred in a negotiated turnkey procurement. The plaintiff claimed that defendant failed to follow the procedures in its "Turnkey Manual." This failure to follow its rules, plaintiff claimed, was arbitrary and capricious and resulted in the plaintiff losing the contract. The court in rejecting plaintiff's claim held that:

> The Turnkey Manual was published to provide standardized guidance to NAVFAC's field divisions in contracts with the housing construction industry. Its purpose was to make available comprehensive in-house procurement procedures for the preparation of RFPs for turnkey projects, and for the evaluation of proposals submitted in response. [*Id.* at 425–26, 678 F.2d at 163.]

The court went on to point out that the Turnkey Manual was "For Official Use Only." *Id.* The manual was designed to give the agency the flexibility necessary in a negotiated turnkey procurement. *Id.* at 426–27, 678 F.2d at 163–64. In addition to recognizing the need for flexibility in the administrative procedures in a turnkey procurement the court also stated: "Contract award in a turnkey housing project inherently is a judgmental process that does not accommodate itself to absolutes." *Id.* at 427, 678 F.2d at 164 (footnote omitted).

The court in *Lincoln Services, Ltd.* concurred with the rule that "not every violation of a procurement regulation * * * makes a valid claim." *Id.* at 425, 678 F.2d at 163. Clearly, every regulation is not established for the benefit of the bidders. *Id.* See also *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 578, 492 F.2d 1200, 1206 (1974). In this case, after reviewing the SSP the court concludes that the regulations were designed to aid the government in exercising its judgment in this matter and not to confer rights upon the bidder.[6]

---

**6.** Plaintiff also contends that in reality defendant was the only proposer within the competitive range. Plaintiff asserts that ASPR 3–807(1) mandates at least two offerors to satisfy the statutory negotiation requirements. Defendant claims that it had at least two proposers within the competitive range that it was negotiating with. Even assuming plaintiff to be correct: (1) such a regulation was not promulgated for the benefit of bidders, it was promulgated to ensure that the government secured the best product for the lowest cost through a competitive process, and (2) it is difficult to perceive how the plaintiff was injured by such governmental actions given that it was awarded the contract. It is interesting to note that most of the suits involving the issue of governmental noncompliance with regulations promulgated to guide the awarding of contracts were brought by contractors who were not awarded the contract.

Plaintiff additionally argues that defendant should have provided cost estimates that plaintiff could use as a yardstick. The government provided plaintiff with its estimate in the form of a cost limitation that was the best plaintiff could do in a turnkey procurement posture. Obviously when each bidder is submitting its own design, defendant cannot be expected to arrive at a cost estimate beforehand. In this case one proposal included solar homes while plaintiff's design was more conventional. Clearly, a cost limitation figure from the government was all that the proposers could expect for an estimate in that contract.

Implicit in plaintiff's arguments in its briefs and during counsel's oral argument concerning defendant's failure to comply with its own regulations is an allegation of bad faith. Plaintiff's counsel intimated that defendant manipulated its regulations and failed to utilize its expertise to discover obvious errors in an attempt to

Given this conclusion, the court further finds that defendant was not bound to strictly follow the SSP. With the degree of flexibility necessary in this inherently judgmental process, the court, even accepting all of plaintiff's factual assertions, cannot conclude that defendant should have known of plaintiff's mistakes. Without the requisite constructive notice, plaintiff is not entitled to reformation. *See Aydin Corp. v. United States, supra,* 229 Ct.Cl. at 316, 669 F.2d at 686; *Wender Presses, Inc. v. United States, supra,* 170 Ct.Cl. at 485, 343 F.2d at 962.

■ The court recognizes the general rule that "acceptance of a bid containing a palpable, inadvertent error cannot result in an enforceable contract." *Wender Presses, Inc. v. United States, supra,* 170 Ct.Cl. at 486, 343 F.2d at 962–63. *See also Moffett, Hodgkins & Clarke Co. v. Rochester,* 178 U.S. 373, 20 S.Ct. 957, 44 L.Ed. 1108 (1900). It follows from this that an "offeree will not be permitted to snap up an offer that is too good to be true; no agreement based on such an offer can then be enforced by the acceptor." 1 *Williston on Contracts* § 94 (3d ed. 1957). In this case no such effort to "snap up" a clearly erroneous bid is evident. The correspondence submitted to the court evidences a lengthy negotiation process. During this process plaintiff concluded, by making certain reductions so that it could produce the 100 units for the amount defendant stated it was limited to. The correspondence indicates an effort on both sides to arrive at a figure that both could work with. Clearly, if no contractor determined that it could perform the work for that stated amount, the government would have had to reevaluate its cost limitations. *See Lincoln Services, Ltd. v. United States, supra,* 230 Ct.Cl. at 419, 678 F.2d at 159. Additionally, if an individ-

ual proposer could not work within the cost limitation it was free to drop out of consideration as one proposer did in this case.

In addition to the above legal bases for denying plaintiff's motion for summary judgment and granting defendant's, the court is convinced that another legal point weighs against plaintiff's claims for reformation. When defendant distributed the RFP in this case the applicable statutory cost limitations included an average unit cost not to exceed $30,000 with a maximum ceiling of $46,000 per individual unit. *See* Pub.L. No. 93–552, *supra.* This limitation on cost included certain additional items and construction services as mandated in section 502(a). Not all these additional items were included so that defendant settled on a final limit of $2,728,500.

After the RFP was distributed, Congress raised the average per unit and maximum cost limitations prior to the date the proposals were due. The new statute made it clear that these amended cost limitations were applicable to all construction contracts which had not been executed. *See* Pub.L. No. 94–107. *supra.* Contrary to plaintiff's reading of section 502(d), the court has found no support for the contention that these new limits had to be utilized in establishing the limitation on bids or that contractors had to be informed of this statutory change. Section 502(d) states that the new *limitations* shall apply for all new construction contracts. This statute was interpreted by defendant to mean that such new limitations could be applied if necessary, but such a limitation was not a mandate to spend that amount. The court opines that the Air Force's interpretation, the agency affected by the legislation, is reasonable, comports with common sense, and is entitled to great weight. *See Sea-*

acquire an obvious "good deal" for the government. These naked arguments fly in the face of the principle that there is a strong presumption that government officials act in good faith. *See Carrier Corp. v. United States, supra,* 6 Cl.Ct. at 176 n. 2 (1984); *Eagle Constr. Corp. v. United States,* 4 Cl.Ct. 470, 479 (1984); *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 746, 572 F.2d 786, 805 (1978). In this case, the court concludes

based on the materials before it that plaintiff has not shown, nor would it most probably be able to prove at trial with "well-nigh irrefragable proof" that government officials did act in bad faith in the negotiation process in this case. *See Carrier Corp. v. United States, supra,* 6 Cl.Ct. at 174 n. 2; *Knotts v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954).

*Land Services, Inc. v. United States*, 204 Ct.Cl. 57, 76, 493 F.2d 1357, 1368 (1974), *cert. denied* 419 U.S. 840, 95 S.Ct. 69, 42 L.Ed.2d 67 (1974). *See also Bunge Corp. v. United States*, 5 Cl.Ct. 511 (1984); *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (construction given a statute by officers or agency charged with its administration entitled to great weight).

Not only was the cost limit set out in the RFP proper considering the statutory guidelines, but defendant also considered it adequate to construct the housing. This belief was borne out after thorough negotiations when plaintiff announced that it could perform the job for the set amount. If none of the bidders determined they could do the job for that figure it could have been increased by the agency. However, plaintiff confirmed that it could do the job for that amount and a contract was signed.

The court is of the opinion that, notwithstanding any of the other arguments set forth by plaintiff, the above agreed-upon amount is the extent of the damages potentially recoverable by plaintiff. The court bases this conclusion by analogizing this cost agreement to a Limitation of Cost clause. It is clear that Congress adopted these cost limitations to place a ceiling on the cost of military housing while providing uniform housing to all military personnel who choose to utilize such housing. In this case, defendant set a cost limitation within these Congressionally mandated limits and plaintiff agreed to that figure. The court finds that a great deal of similarity exists between this cost limitation and a Limitation on Cost clause.

■■■ Limitation on Cost clauses are designed to allow government officials to place limits on project expenditures unless it is determined by them that additional expenditures are warranted. 2 *McBride & Wachtel, Government Contracts*, § 23.-30[3] (1984). When such limit or cost clauses are incorporated into a contract, the contractor may not incur a cost overrun which it expects the government to pay without first giving notice of the necessity

for increased funding. *Id.* It is uncontradicted that no such notice was given to defendant until a claim of mistake was filed in the Government Accounting Office more than two years after the contract was awarded.

■■■ There are exceptions to the rule prohibiting cost overruns without advance approval. "If the government causes or induces the contractor to incur expenses beyond [sic] the maximum costs specified in the contract then approval is unnecessary." *Id.* at § 23.30[4]. Such "causes" include changes required by the government or breaches of contract by the government. *See Raymond Constructors of Africa, Ltd. v. United States*, 188 Ct.Cl. 147, 166–67, 411 F.2d 1227, 1237 (1969); *Scherr & McDermott, Inc. v. United States*, 175 Ct.Cl. 440, 360 F.2d 966 (1966); *Anthony P. Miller, Inc. v. United States*, 172 Ct.Cl. 60, 348 F.2d 475 (1965). Instead of arguing that the government "caused" its overrun, plaintiff here would claim that defendant induced plaintiff's mistake and subsequent overrun. The court cannot conclude that defendant induced plaintiff to make any errors. Given the thorough negotiations between the parties, plaintiff had ample opportunity to determine (1) whether it could perform the work for the stated cost limit and (2) whether it had made any errors.

Courts have consistently upheld the use of limitation on cost clauses in government contracts. *See Greenfield Tap & Die Corp. v. United States*, 68 Ct.Cl. 61, 77 (1929), *cert. denied*, 281 U.S. 737, 50 S.Ct. 333, 74 L.Ed. 1152 (1930). *See also National Civil Service League v. United States*, 226 Ct.Cl. 478, 643 F.2d 768 (1981) (cost ceiling utilized). In holding the plaintiff to the maximum amount allowed under the contract in *Greenfield Tap & Die Corp. v. United States*, *supra*, while requiring it to complete the remainder of the work without additional compensation the court stated:

This may have been an improvident provision as far as plaintiff is concerned, but it is the contract which it made and by

which it must abide. *Stewart-McGehee v. United States* (58 Ct.Cl. 1, 9). It was paid and accepted $100,000, so far as appears from the findings, without protest or objection * * *. [*Greenfield Tap & Die Corp. v. United States, supra,* 68 Ct.Cl. at 77.

In this case it is clear that plaintiff knew defendant was insisting on a limitation of $2,728,500. After negotiation it agreed to do the job for $2,728,350. This attempt to meet defendant's limit may have been "improvident" but they both agreed on the amount, an amount defendant emphasized as its cost limitation. Plaintiff performed the work without giving defendant notice of overruns. It accepted payment for the work. Subsequently, it filed a claim with the Government Accounting Office asserting mistake. Given these facts and using the limitation on cost clause analogy, this court concludes that plaintiff's damages in any event would be limited to $2,728,500 which is essentially what it has already received.

■ Finally, the court's reasons for denying the desired reformation are in complete congruence with the general policy of maintaining the integrity of the competitive bid process. Generally, a bidder should not be able to profit from his own mistakes or negligence. 9 *McBride & Wachtel, supra,* § 12.80[7]. If this court reformed the contract and awarded plaintiff an additional $511,360, this amount when added to its final bid of $2,728,350 ($3,239,710), would result in plaintiff becoming the second highest overall bidder. See text, p. 3, *supra.* Clearly, such a result would not promote the integrity of the process, and would be contrary to decisions of the Comptroller General, this court, and the Federal Circuit Court of Appeals. *See United States v. Hamilton Enterprises, Inc.,* 711 F.2d 1038, 1048 n. 8 (Fed.Cir. 1983); *Charnick v. United States, supra,* 178 Ct.Cl. at 506–07, 372 F.2d at 497; *Broker Lanse Enters, Inc.,* 56 Comp.Gen. 1 (B–186847), 76–2 CPD 314 (1976). *Cf. M.L. Shepard v. United States,* 95 Ct.Cl. 407 (1942).

## C. *Conclusion*

Based on the above discussion, the court concludes that no material issue of fact exists and that defendant's motion for partial summary judgment should be granted. The court denies plaintiff's cross-motion for summary judgment. As a result of this determination, there remains for further proceedings consideration of defendant's counterclaim. The parties are directed to advise the court within 30 days from the date of this opinion whether they can resolve the counterclaim issue without the necessity for further proceedings. If trial is necessary in this regard, then further proceedings shall take place under the pretrial order on defendant's counterclaim issued in this case on August 23, 1983.