**CONNELLY CONTAINERS, INC.**

**v.**

**The UNITED STATES.**

**No. 607–83C.**

United States Claims Court.

Feb. 20, 1985.

James M. Marsh, Philadelphia, Pa., for plaintiff; LaBrum & Doak, Philadelphia, Pa., of counsel.

Michael T. Paul, Washington, D.C., with whom was Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., for defendant.

## OPINION

WOOD, Judge.

In this case, before the court on cross-motions for summary judgment, plaintiff, a Pennsylvania corporation having its principal place of business in Bala Cynwyd, Pennsylvania, sues to recover additional compensation under a requirements contract obligating it to supply to defendant various types and sizes of triple wall fiberboard shipping boxes.

Plaintiff alleges that its unit price quotation on one type and size of box (line item 33, Group 7, "F.O.B. Destination" Stockton, California), mistakenly omitted any charge for freight.[1] Plaintiff asserts that the contracting officer (1) was "put on notice" of plaintiff's mistaken bid for delivering the said shipping boxes to Stockton, but did not request verification of plaintiff's actual bid quotation for doing so prior to award, and (2) after award, erroneously failed to permit correction of plaintiff's mistaken bid. Plaintiff concludes that it is accordingly entitled to recover $35,698.96, the amount by which its intended bid price for the number of units in fact ordered from plaintiff and delivered by it to defendant in Stockton under line item 33 exceeded its actual bid price for those units, plus interest, costs, and attorney fees.

In opposing plaintiff's claim of right to recover herein, defendant contends that, accepting *arguendo* plaintiff's claim of failure to include in its bid a freight charge for a single line item in one group, the contracting officer (1) had no actual knowledge of the alleged error prior to contract award, and (2) as a matter of law, cannot properly be charged with constructive knowledge of a possible mistake in plaintiff's bid on line item 33. Thus, defendant asserts, plaintiff's complaint should be dismissed.

For the reasons and under the circumstances hereinafter set forth, the court concludes that on the material facts concerning which there is no genuine issue, plaintiff is entitled to recover to the extent stated below. Plaintiff's motion for summary judgment is granted in part and, without prejudice, denied in part. Defendant's cross-motion for summary judgment is denied.

## FACTS

On September 19, 1980, defendant, acting through the General Services Administration ("GSA"), issued a solicitation for offers (Solicitation No. 5FCB–08–80–081, hereinafter "the solicitation") on a requirements contract for triple wall fiberboard shipping boxes of various types and sizes, to be delivered "F.O.B. Destination and/or F.O.B. Origin as specified herein." The solicitation encompassed 166 line items, representing 43 different National Stock Numbers.[2] The 166 line items were divided into 14 separate "Groups"; a "Group" was defined as "all items delivered to one destination."[3] The solicitation provided that bids might be submitted "f.o.b. origin and/or f.o.b. destination for evaluation or delivery to the delivery points specified herein," on a less-than-truckload (LTL) basis, on a carload (CL) basis, or on both.

Bidders were advised that for the purpose of evaluating F.O.B. origin bids, on either an LTL or a CL basis, the appropriate unit freight cost would be added to the unit price bid, and that

> "Award will be made in the aggregate by *GROUP*, either F.O.B. ORIGIN or F.O.B. DESTINATION * * * based on the lowest delivered cost to the Government for both the Less-Than-Truckload

---

1. Line item 33 (and Group 7) will be explained below.

2. *E.g.,* line item 33 concerned "National Stock Number 8115–00–753–4691, 58 × 32⅜ × 28¼, Style 6, Type III, Size 14″ (hereinafter NSN 4691) boxes, with an ultimate destination of Stockton, California, and an estimated 12-month requirement of 1525 units. As will appear, NSN 4691 boxes were also destined for delivery to seven other locations as well.

3. *E.g.,* Group 7 (Stockton, California) included line item 33 and some 31 other line items as well.

(LTL) and Carload (CL) quantities shown for each item evaluated on * * * " defendant's estimated 12 month requirement. (Emphasis in original). Bidders were further advised that the low aggregate bidder would be determined by reaching a total bid price, either F.O.B. origin or F.O.B. destination, for each item in a specified manner, and by then adding the bid prices of all items in the group to arrive at a total aggregate group bid price.

Four bids were opened at bid opening November 21, 1980. Three of the four contained bids on Group 7, composed of 32 line items including line item 33. Plaintiff's aggregate bid on Group 7, F.O.B. destination (Stockton, California), was $3,400,151.25. The bid of one bidder on Group 7 ($3,110,332.45, F.O.B. origin) was determined to be non-responsive. The bid of the other bidder on Group 7 ($2,881,-832.30, F.O.B. origin), when adjusted in accordance with the solicitation by adding unit freight cost, was determined to be $3,562,663.12, some $162,500 (or about 5 percent) greater than plaintiff's bid on Group 7.

NSN 4691 boxes, to be shipped under line item 33 (see note 2, *supra*) were also to be shipped to seven other locations, each (by definition) in a different Group. Plaintiff's unit price bid on line item 33, Group 7, F.O.B. destination (Stockton, California) was $11.68 LTL, and also $11.68 CL. Plaintiff's unit price bid for delivering NSN 4691 boxes to each of the seven other locations involved was as follows:

| Line Item | Location | Unit Price LTL FOB Destination | Unit Price CL FOB Destination |
|---|---|---|---|
| 26 | Savannah, GA | 11.52 | 11.52 |
| 27 | Duluth, GA | 11.57 | 11.57 |
| 28 | Shelby, OH | 11.63 | 11.63 |
| 29 | Denver, CO | 14.64 | 14.64 |
| 30 | Fort Worth, TX | 12.76 | 12.76 |
| 31 | Kansas City, MO | 13.99 | 13.99 |
| 32 | Belle Mead, NJ | 10.80 | 10.80 |

As the foregoing clearly reflects, plaintiff, located in Pennsylvania, quoted a bid price on line item 33, F.O.B. destination Stockton, California, very close to its bid price for delivering the same unit F.O.B. two destinations in Georgia, and nearly three dollars (or 20 percent) *less* than its bid price for delivering the same unit F.O.B. destination Denver, Colorado, some 1,000 miles or so nearer Pennsylvania than Stockton.[4]

By mailgram, dated December 19, 1980, the contracting officer requested that plaintiff "verify [its] prices" for Groups 1, 2, 3, 4, 5, 6, 8, 9, 10, and 11, "since prices per group are approximately 10 percent or more, lower than the next low bidder."[5] The percentage difference between its evaluated aggregate bid on Group 7 and that of the only other responsive bidder for that Group was less than five percent. Perhaps for that reason, plaintiff was not asked to verify its Group 7 price quotation. Plaintiff duly verified its bids on each of the Groups noted in the December 19, 1980 mailgram, and, on March 3, 1981, plaintiff was awarded a contract covering Groups 1 through 13.[6] The contract period extended to August 31, 1981.

4. With this single exception, plaintiff's bid price for shipping a particular kind of box (and the solicitation included 43 different National Stock Numbers) to Denver was invariably lower (generally by about 10 percent) than plaintiff's bid price for shipping that same kind of box to Stockton.

5. The "percentage differences" stated in the mailgram ranged from 10 to 23 percent.

6. Plaintiff did not bid on Item 60, Group 14, involving shipping boxes to be delivered to Honolulu, Hawaii. It was not asked to verify its bids on Groups 12 and 13.

In June 1981, plaintiff advised GSA by letter that its $11.68 quotation on line item 33 had not included "any freight charges," and asked that the contract be modified to include unit freight costs of $4.52, and a unit price of $16.20, under item 33.[7] The contracting officer ultimately denied the relief requested, concluding, in substance, that there was no clear and convincing evidence of a mutual mistake, and that the alleged unilateral mistake in bid was not so apparent as to have charged the contracting officer with notice of the probability of a mistake.

## DISCUSSION

Where a unilateral mistake in a plaintiff's bid is asserted long after a contract incorporating the supposedly mistaken bid has been awarded, the plaintiff may obtain relief from the mistake only if (among other things) the contracting officer knew or should have known that the bid was based on or embodied a costly mistake, but nonetheless accepted the bid without adequately seeking verification of it. *Aydin Corp. v. United States*, 669 F.2d 681, 229 Ct.Cl. 309 (1982); *see also C & L Constr. Co. v. United States*, 6 Cl.Ct. 791, 800–02 (1984), and cases there cited. While the contracting officer is not, and should not be, required to serve as a guardian for a bidder seeking a government contract, the courts are concerned about, and where appropriate will protect against, "over-reaching of a contractor by a contracting officer when the latter has the knowledge, actual or imputed as something he ought to know, that the bid is based on or embodies a disastrous mistake, and accepts the bid in face of that knowledge." *Ruggiero v. United States*, 420 F.2d 709, 713, 190 Ct.Cl. 327 (1970); *see also Carrier Corp. v. United States*, 6 Cl.Ct. 169, 173 (1984).

Plaintiff contends, in essence, that the contracting officer should have known, prior to accepting plaintiff's bid on Group 7, that plaintiff had made a mistake in bidding as it did on line item 33, and therefore should not have accepted plaintiff's Group 7 bid without seeking verification of the line item 33 quotation.[8] In testing the merit of that contention, the single, and determinative, issue is "whether under all the facts and circumstances of the case there were any factors which reasonably should have raised the presumption of error in the mind of the contracting officer * * *." *Chernick v. United States*, 372 F.2d 492, 496, 178 Ct.Cl. 498 (1967); see also *Aydin Corp.*, 669 F.2d at 686. Pointing to its varying bid prices for NSN 4691 boxes F.O.B. different destinations, as well as its bid prices for delivering other kinds of boxes F.O.B. to both Stockton, California, and Denver, Colorado, plaintiff contends that these disparities were both obvious and more than enough to put the contracting officer on notice that a mistake in bidding might well have been made, and thereby to give rise to an affirmative duty to seek verification.[9]

In arguing for a diametrically contrary conclusion, defendant would focus the court's attention upon plaintiff's overall bid for Group 7 items as it appeared in the government's abstract of bids (prepared after bid opening). Defendant notes that the

7. Precisely when the contracting officer received this request is unclear. Nor, for that matter, does it appear when performance of the Group 7 award was completed. On the pleadings and exhibits before the court, however, there is no real dispute about (1) plaintiff's intended bid price (including unit freight costs) on line item 33, (2) the inadvertent omission of line item 33 unit freight costs of $4.52, or (3) the total number of line item 33 units eventually ordered from plaintiff and delivered by it to Stockton.

8. There is no claim of actual knowledge of the mistake. Plaintiff does assert both that the contracting officer should have sought verification of plaintiff's line item 33 bid prior to award, and that he should have permitted correction after award. On analysis, these contentions are but different facets of a single argument. *See* 41 CFR §§ 1–2.406–1, 1–2.406–4 (1981).

9. Plaintiff does not rely upon any alleged disparities between its own bid and those of other bidders on line item 33 itself. *Cf. Aydin Corp.*, 669 F.2d at 686; *Wender Presses, Inc. v. United States*, 343 F.2d 961, 963–64, 170 Ct.Cl. 483 (1965); 47 Comp.Gen. 365 (1968).

abstract of bids reflects an overall bid by plaintiff on Group 7, F.O.B. destination, of only 5 percent or so less than the next lowest bidder's total evaluated bid on Group 7, and asserts that this difference is so miniscule as to be devoid of any significance. As defendant sees it, the disparity in Group 7 total bid prices was and is wholly "inadequate by [itself] to dictate a finding of imputed knowledge."

■ As defendant asserts, a "mere disparity between bids does not automatically lead to the conclusion that the test for constructive notice has been satisfied." *Aydin Corp.*, 669 F.2d at 686. It is, moreover, clear that awards pursuant to the solicitation were to be made by Group, and that plaintiff's evaluated bid on Group 7 as a whole and that of the only other responsive bidder on that Group were in any event within five percent of each other.

Were there no other " 'factors which reasonably should have raised the presumption of error in the mind of the contracting officer' * * *," *Wender Presses, Inc. v. United States*, 343 F.2d 961, 963, 170 Ct.Cl. 483 (1965), it would undoubtedly be improper to impute to the contracting officer knowledge of a mistaken bid on line item 33. See *Allied Contractors, Inc. v. United States*, 310 F.2d 945, 159 Ct.Cl. 548 (1962). There are in this case, however, other factors which reasonably should have raised the possibility of an error in bidding in the mind of the contracting officer, and which, notwithstanding defendant's arguments otherwise, justify an imputation to defendant of constructive knowledge of that error.

Plaintiff's bid, necessarily examined and evaluated by defendant on a line item by line item basis, contained eight separate bid prices for furnishing NSN 4691 boxes, F.O.B. destination. Those eight separate bid prices (on line items 26 thru 33) appeared together in the bid (albeit four of the line items, and bid prices, did appear on one page, and the other four appeared at the top of the next).

Given the same shipping point (Bala Cynwyd, Pennsylvania) for each of these eight line items, there are sharp and obvious discrepancies between plaintiff's bid prices for shipping exactly the same item to the several different geographic locations within the United States. A unit bid price for NSN 4691 boxes F.O.B. destination Stockton, California, of $11.68, was plainly, and considerably, less than plaintiff's unit bid price for NSN 4691 boxes F.O.B. destination Fort Worth, Texas ($12.76), Kansas City, Missouri ($13.99), or Denver, Colorado ($14.64), all substantially closer to Pennsylvania than Stockton. These sharp and obvious discrepancies, reasonably viewed, should have alerted the contracting officer that a mistake in bidding may have been made.[10] *See* 1B McBride and Wachtel, Government Contracts §§ 12.40 [7] at 12–58, 12.40 [8] (1984); Comp.Gen.Dec. B–173781, September 7, 1971 (unpublished), 16 Cont.Cas.Fed. (CCH) ¶ 80,701.[11] Thus, the contracting officer was under an affirmative duty to verify plaintiff's line item 33 bid prior to accepting its bid on Group 7. *Ibid; See also BCM Corp. v. United States*, 2 Cl.Ct. 602, 610 (1983).

In light of the foregoing, and on the undisputed facts of this case, defendant's motion for summary judgment is denied, and plaintiff's motion—to the extent that it seeks a ruling that plaintiff is entitled to $35,698.96—is granted.[12] To the extent, if any, plaintiff seeks additional relief by way

---

10. A comparison of plaintiff's line item 33 bid price with plaintiff's bid prices F.O.B. destination Duluth and Savannah, Georgia, and Shelby, Ohio, is also revealing. These bid prices all F.O.B. destination, ranged from a low of $11.52, F.O.B. destination Savannah, Georgia, to a high of $11.68, only 14 *cents* more, F.O.B. destination Stockton, California.

11. *See also* Doke, *Mistakes in Government Contracts—Error Detection Duty of Contracting Officers*, 18 SW L.J. 1, 18–19 (1964).

12. The amount stated is derived by multiplying $4.52, the mistakenly omitted unit freight cost for delivery of line item 33 F.O.B. destination Stockton, California, by 7898, the number of line item 33 units plaintiff delivered to Stockton at its bid price of $11.68 per unit.

of its present motion for summary judgment herein, however, the motion is, without prejudice, denied.

 While plaintiff also asserts a right to interest, costs, and attorney fees, (albeit on exactly what grounds are not specified), these matters have not been briefed by either party. Assuming, for present purposes, an entitlement to interest, the record as it now stands is not really adequate to permit the court to reach informed conclusions.[13] As to attorney fees, see 28 U.S.C. § 2412(d) (1982); RUSCC 81(e); *Snowbank Enterprises, Inc. v. United States*, 7 Cl.Ct. 388 (1985). As to costs, see *Snowbank* and cases there cited. In the present posture of this case, plaintiff has demonstrated no present right to relief in any of the areas just described.

Absent prior disposition of this case, a status conference will be held at 10:00 A.M. Friday, March 22, 1985, in Courtroom 6, Room 507, The National Courts Building, 717 Madison Place, N.W., Washington, D.C., 20005. At that time, counsel for the parties should be prepared to inform the court of their intentions respecting further proceedings herein, and to agree upon a schedule within which any such proceedings contemplated shall occur. Counsel for plaintiff may participate in person or by telephone conference call to be placed by the court.

IT IS SO ORDERED.

---

**13.** The contract was a requirements contract covering a period of time and (apparently) calling for deliveries from time to time. The details surrounding plaintiff's claim (or claims) to the contracting officer, and the delivery (or deliveries) of the units here in dispute to Stockton, might well be relevant in evaluating a claim to interest.