## NATIONAL CIVIL SERVICE LEAGUE

### v.

### The UNITED STATES.

### No. 330–79C.

United States Court of Claims.

Feb. 25, 1981.

Before DAVIS, Judge, SKELTON, Senior Judge, and SMITH, Judge.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

SKELTON, Senior Judge:

This is an appeal by the National Civil Service League (Appellant) for a review under the standards of the Wunderlich Act (41 U.S.C. §§ 321–322) of a decision of the Department of Housing and Urban Development Board of Contract Appeals (HUDBCA or the Board) which affirmed a denial by a contracting officer of Appellant's claim for a cost overrun reimbursement it incurred as a contractor in the performance of contract No. H–1092 between it and the Department of Housing and Urban Development (HUD).

The basic facts giving rise to this case are set forth in the opinion of the Board in HUDBCA No. 76–23, September 19, 1978, which we repeat, as follows:

### STATEMENT OF FACTS

Appellant is a non-profit corporation, seeking to improve federal, state, and local civil service policies. On June 27, 1969, Appellant contracted with the Department of Housing and Urban Development (hereinafter HUD or the Government) to provide technical assistance and reports in connection with the Model Cities Program. The contract was awarded on a cost-no-fee basis, and contained the standard cost reimbursement clauses including the Allowable Cost, Fixed Fee and Payment, and Limitation of Cost articles prescribed by the Federal Procurement Regulations. Provisional overhead rates were established during negotiations with actual rates to be adjusted after each fiscal year.

Performance of the original agreement was to be complete within thirteen months of the effective date of the contract, and total allowable direct and indirect costs were estimated not to exceed $200,000. On

Leonard A. White, Washington, D. C., attorney of record for plaintiff National Civil Service League.

Kenneth R. Melvin, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

July 27, 1970, certain additional tasks were added and the total estimated cost was adjusted to $220,000 (Modification No. 1). Until that date, Appellant was being paid from HUD funds allocated to the Model Cities Program. In June, 1970, HUD entered into a transfer of funds agreement with the Department of Labor. After execution of this agreement, the contract between HUD and the Appellant was modified five more times. These amendments ultimately extended the period for contract performance to June 30, 1974, and substantially increased the total estimated contract amount to $1,583,351, including a fixed fee of $59,300. Funding of these amendments was derived from the transfer of monies pursuant to the agreement with the Department of Labor.

Amendment No. 5 to the contract executed on June 27, 1973, inserted the following language:

"Whereas, it is the intent of the parties to amend this contract to provide a ceiling amount and any costs exceeding the ceiling amount are to be borne by the Contractor solely . . .

3. Article III, Estimated Cost, Fixed Fee and Payment, is amended by . . . adding a new Paragraph A and amending B as follows:

A. Notwithstanding any rights the Contractor may have under any portion or portions of this contract, the Contractor agrees to complete all work required by this contract and that he shall [be] reimbursed for allowable costs up to a ceiling amount which is the total amount contained in Block 21 of the face page. In the event that actual allowable costs are below the ceiling amount the Contractor shall be reimbursed for such actual allowable costs."

The estimated total cost of the contract was increased by that amendment to $1,495,351. The testimony indicated that the ceiling was imposed because Appellant was experiencing steadily increasing overhead rates, several overruns had already occurred, and HUD wanted to avoid any obligation over and above the funds transferred from the Department of Labor. Because of delays caused by some of the local offices in the Model Cities Program, Appellant was unable to complete its contractual obligations within the prescribed ceiling. Consequently, an additional amendment was requested for an increase of $88,000 in the ceiling price, and Appellant indicated at that time that the additional funding would be "the final amount necessary to complete the previously referenced contract tasks." The request was granted, and on May 7, 1974, Modification No. 6 to the contract was executed. The amendment increased the ceiling price to $1,583,351, and restated without change the language forbidding reimbursement of costs incurred in excess of that amount.

Performance of the contract was completed on June 30, 1974, and the work product was described as "excellent" by the Government Technical Representative. Appellant's final payment voucher, which was submitted on June 30, 1975, indicated that total expenditures including the fixed fee were $1,583,970.27, which exceeded the contractually set ceiling by $619.27. The voucher was based on a 55.7% overhead rate for fiscal years 1973 and 1974, the provisional rate established by Modification No. 5.

A post-contract audit was conducted by the Government in November, 1975. The Government auditor found that $6,790.98 of the claimed direct costs were questionable, and that actual expenditures on overhead exceeded the provisional amount by $32,439.18. The auditor concluded that the actual overhead rates for fiscal years 1973 and 1974 were 60.9% and 81.6%, respectively. The auditor testified that Appellant's accounting system was adequate to record and support costs allocable to the contract on a historical basis, and that it should have become aware that the provisional overhead rate was too low after three months of consecutive overruns. Consequently, Appellant should have discovered the 1973 overrun when the final figures were posted shortly after the close of the fiscal year in

January, 1974. The actual 1974 overhead rate did not begin exceeding the provisional rate, however, until June of 1974 with a steady increase in the actual rate throughout the remainder of the year. Therefore, Appellant did not have actual knowledge of the 1974 overrun until several months after it completed performance of the contract on June 30, 1974.

The Board also described the contentions of the parties in the following language.

## POSITION OF THE PARTIES

The Government contends that reimbursement for any additional costs is barred by the ceiling provision in Article III of the contract. Even if the ceiling amount is not controlling, the Government argues that Appellant failed to give timely notice of an impending overrun within the meaning of the Limitation of Cost Clause and therefore is barred from recovery.

Appellant raises a number of arguments to avoid a strict application of the ceiling. It contends that:

1) The Government waived the ceiling limitation by its "acquiescence or inducement to NCSL to continue work."

2) The Government was obligated to fund the overrun, since it was proximately caused by the "administrative actions and inactions of the Contracting Officer and his representatives."

3) The ceiling language should be rescinded because it was the product of a mutual mistake, i. e., reliance on the provisional overhead rate.

Even if the ceiling limitation is upheld, Appellant contends that the Limitation of Cost clause authorizes payment of the overrun. Appellant argues that the submission of monthly vouchers containing the current level of expenditures adequately apprised the Government of any potential overrun within the meaning of the Limitation of Cost clause. Finally, Appellant asserts that notice was excused since the Appellant could not have known or predicted its actual overhead rate prior to completion of the contract, and the Contracting Officer abused his discretion by refusing to fund

the overrun, *General Electric Company v. United States*, 194 Ct.Cl. 678, 440 F.2d 420 (1971).

## DISPOSITION OF THE CASE UNDER THE WUNDERLICH ACT

The Board denied Appellant's cost reimbursement claim of $39,230.16 on September 19, 1978, and on December 1, 1978, denied Appellant's motion for reconsideration. The Appellant appealed to this court on August 23, 1979, claiming that the decision of the Board was arbitrary, capricious, and not supported by substantial evidence and was erroneous as a matter of law. The Appellant also asks for a reformation of the contract by a rescission of the ceiling contained in Modifications Nos. 5 and 6, which it alleges were inserted into the contract "because the parties mistakenly relied on stale provisional rates in computing the ceiling."

The case is before us on cross-motions for summary judgment. We hold for the defendant.

■ At the outset we point out that our authority to review a decision of a Board of Contract Appeals under the Wunderlich Act (41 U.S.C. § 321–322), such as that involved in this case, is limited to a determination of whether the Board's findings are fraudulent, arbitrary, or capricious or so erroneous as to imply bad faith, or are not supported by substantial evidence, and whether the Board's decision is erroneous as a matter of law. *See United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966); *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); *Marley v. United States*, 191 Ct.Cl. 205, 213, 423 F.2d 324, 328–329 (1970); *H & H Mfg. Co. v. United States*, 168 Ct.Cl. 873, 877 (1964). Therefore, we examine the decision of the Board subject to these limitations on our role as a reviewing court.

■ The original agreement contained a Limitation of Cost clause which required

the Appellant to notify HUD within 60 days when it had reason to believe that its costs would exceed 75% of the total estimated cost of the contract. Upon the giving of such notice, the contracting officer would decide whether to fund the overrun. The Appellant never gave any such notice, and now claims that it should be able to recover the cost overrun because of the holding of this court in *General Electric Co. v. United States, supra,* that a contractor could recover such costs even though he did not give the notice required by the Limitation of Cost clause. The Appellant is in error in taking this position, because in *General Electric* the court was considering such a clause that had not been modified by an imposition of an absolute ceiling on the costs, which is not the situation in the instant case. Here, as the Board points out, Modification No. 5 clearly sets forth the intent of the parties "to provide a ceiling amount and any costs exceeding the ceiling amount are to be borne by the contractor solely."

We agree with the Board that the effect of the ceiling limitation was to convert the original cost reimbursement contract into a limited price type arrangement which prohibits recovery by Appellant of costs in excess of the ceiling amount. The meaning of the modification was clear and unambiguous and obligated Appellant to complete the contract within the amount provided by the modification.

The Article III amendment superceded the Limitation of Cost clause and specifically provided that there would be no reimbursement for costs in excess of the ceiling "notwithstanding any rights the contractor may have under any portion or portions of this contract." The ceiling was absolute whether or not the overrun was anticipated by the Appellant and the Limitation of Cost clause was no longer controlling.

The Appellant argues that HUD waived the ceiling provision by its willingness for Appellant to continue the work. We do not agree. The contracting officer asked the Appellant on February 1, 1974, whether it expected to complete the project within the ceiling limitation. The Appellant did not indicate any cost overrun in its reply. Furthermore, HUD repeatedly informed Appellant that it had exhausted all of its funds for the contract. There was no obligation on HUD to fund future overruns when it increased the ceiling by Modification No. 6 in the sum of $88,000. At the time this was done, HUD specifically asked Appellant if this would be the final amount necessary to complete the contract and Appellant answered in writing that no more funds would be required.

■ The Appellant says that it should recover because HUD failed to make a yearly audit. This is without merit. There was no express provision in the contract requiring such an audit. Furthermore, Appellant had an obligation to monitor its own costs without waiting for an audit by HUD. Its accounting system provided a monthly record of all direct and indirect cost expenditures. Consequently, it was not misled or prejudiced by the lack of yearly audits by HUD. The Appellant should have discovered the 1973 costs overrun at the close of that fiscal year. The contract was finished June 30, 1974, so an audit at the end of that year would not have affected cost expenditures.

■ The Appellant claims that the finding by the Board that the Appellant was unable to complete its contractual obligation within the prescribed ceiling because of delays by some of the local offices in the Model Cities Program is not supported by substantial evidence. This is incorrect. The record contains letters which support the Board's finding. One of the letters from Henry C. Casanave, Jr., Associate Director of Appellant, to the contracting officer in which a request was made for an additional amount of $88,000 (later granted in Modification No. 6) stated as a reason for the request that delays in local Model Cities offices was the cause of Appellant's cost overruns. We conclude that this finding is supported by substantial evidence.

The Appellant contends that the finding by the Board that the ceiling was imposed because Appellant was experiencing steadi-

ly increasing overhead rates and that several overruns had already occurred is not supported by substantial evidence. The record supports the Board in this finding. Besides, the Board did not limit its finding to the above facts as to the reason for the imposition of the ceiling, because it also found that the ceiling was imposed because HUD wanted to avoid any obligation over and above the funds transferred to it by the Department of Labor. It is clear that HUD wanted a cut-off point on its financial obligation to the Appellant. It is well settled that the Government may place a limit upon its total liability under a cost-reimbursement contract such as that in the instant case. *See LSi Service Corp. v. United States*, 191 Ct.Cl. 185, 422 F.2d 1334 (1970); *Urban Management Consultants of San Francisco, Inc.*, HUDBCA 75–28, 76–2 BCA ¶ 12,000 (1976). See also, *State of Texas v. United States*, 210 Ct.Cl. 522, 530, 537 F.2d 466, 470 (1976), where we held that when an agency of the Government does all it agreed to do, and all it was authorized to undertake, a plaintiff (in a contract case) can ask no more of the Government. That is the situation in the instant case.

Finally, Appellant contends that Modifications 5 and 6 should be rescinded because the parties mistakenly relied on a stale provisional overhead rate of 55.7% for 1973 and 1974 when the final audit showed that the rate was 60.9% for 1973 and 81.6% for 1974. However, there is no proof that the ceiling was imposed by reason of the 55.7% provisional overhead rate. As we have already shown, there were various other reasons why the ceiling limitation was imposed. Furthermore, there is no evidence that if accurate provisional overhead rates had

been known that the Government would have agreed to pay for the overrun. See *Ling-Temco-Vought, Inc. v. United States*, 201 Ct.Cl. 135, 475 F.2d 630 (1973). The contract was modified six times as follows:

|  | *Estimated Cumulative Cost* | *Effective Date* |
| --- | --- | --- |
| Basic K | $ 200,000.00 | 6/27/69 |
| Mod. 1 | 218,198.00 | 7/27/70 |
| Mod. 2 | 290,744.00 | 6/30/70 |
| Mod. 3 | 356,759.00 | 6/30/71 |
| Mod. 4 | 964,175.33 | 4/18/72 |
| Mod. 5 | 1,436,051.00 | 6/27/73 |
| Mod. 6 | 1,524,051.00 | 5/07/74 |

The Appellant agreed to each modification. Furthermore, as shown above, substantial consideration was paid to the Appellant by HUD as a result of each modification. Consequently, Appellant is bound by the changes in the contract. We conclude that it has not shown any reason why the contract should be reformed.

We hold that the decision of the Board is not erroneous as a matter of law and that its findings are not arbitrary, capricious or so erroneous as to imply bad faith, and that they are supported by substantial evidence, and that it should be, and it is hereby, affirmed.

Accordingly, the motion for summary judgment of the plaintiff is denied and the cross-motion for summary judgment of defendant is granted and plaintiff's petition is dismissed.