**MAITLAND BROS. CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 428–88 C.**

United States Claims Court.

March 28, 1990.

**54**

Edward J. McCormick, III, Norfolk, Mass., for plaintiff.

Donald Kinner, Washington, D.C., with whom was Stuart M. Gerson, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

In 1977, the Maitland Brothers Company (plaintiff or Maitland) entered a contract with the United States Naval Facilities Engineering Command (Navy). The contract required plaintiff to install submarine pipelines in a trench beneath the Elizabeth River, at Norfolk, Virginia.

Plaintiff laid the pipelines, but the Navy later ordered Maitland to redo the work. The Armed Services Board of Contract Appeals (ASBCA or Board) sustained the Navy's orders.

Plaintiff appeals from the Board's decision. The ASBCA determined that plaintiff did not fulfill the contract requirements. Specifically, the ASBCA found that plaintiff laid the pipelines out of and above the trench on the river bed.

Plaintiff now moves for summary judgment alleging that the Board's decision was not supported by substantial evidence. Defendant cross-moves for summary judgment. After oral argument, this court denies plaintiff's motion and grants defendant's motion.

## BACKGROUND [1]

On December 1, 1977, the Navy awarded plaintiff a contract to dredge an underwater trench. The contract required plaintiff to install in the trench dual 8–inch and 10–inch submarine petroleum, oil, and lubricants (POL) pipelines. These pipelines would convey lubricants under the Elizabeth River from the Craney Island Fuel Depot in Portsmouth, Virginia to the Naval Air Station in Norfolk, Virginia.

The contract specified the route and depths of the trench and pipelines. Drawing Nos. C–2, and C–11 through C–15, depicted these contract requirements. The submarine portion of the pipelines started at station 0+00.00 near the Craney Island disposal area on the northern slope. Over a distance of seven hundred to eight hundred feet, the pipelines descended to a depth of 26½ feet below the river's surface. The pipelines continued at that level across the shallow area referred to as the Craney Island, or western edge of the channel, at station 66+75. From that point, the trench descended to a depth of 76½ feet at station 71+19.40. The trench continued at that depth across the channel to the eastern edge, at station 86+50. At the eastern edge, the trench rose to 61½ feet below the surface. The pipeline remained at this depth until surfacing at the bulkhead, south of Pier 20.

The contract also contained specific clauses allocating responsibility for various aspects of performance:

11. LAYING PROCEDURES AND ALIGNMENT OF SUBMARINE PIPELINE

11.1 The Contractor shall install the pipeline utilizing the approved equipment and laying proceedures [sic] which must be in accordance with generally accepted practices. The installation method must also comply with the restrictions imposed when working in navigable waters as described in section 01011 herein. *The support and stress control of the pipe during the laying, pulling or connecting process shall be in accordance with generally accepted engineering practice specified in API RP 1111 and shall be the entire responsibility of the Contractor.* Approval by the Contracting Officer of the Contractor's construction method shall in no way relieve the Con-

1. In reviewing the ASBCA decision, this court does not make any independent factual find-
ings, but examines the sufficiency of the Board's findings. 41 U.S.C. § 321 (1982).

tractor of his sole responsibility for the project.

*Maitland Bros. Constr. Co.,* 86–3 BCA (CCH), ¶ 19,172 (1986) (Decision), at 96,928–29 (emphasis in original). Thus, the contract made plaintiff responsible to lay and align the pipeline properly in the trench at the required depths.

The contract also defined methods for the pipeline installation:

> 20.4 Backfill in the pipeline trench shall be applied immediately after approved hydrostatic testing of the submarine pipeline is completed.

Decision, at 96,928. The contract did not permit filling the trench until after testing of the pipelines.

The Navy contracted with Van Houten Associates, Inc. (VHA) to determine the specifications for the pipelines. This architectural engineering firm designed the POL pipelines to account for conditions in the Elizabeth River. These conditions included ship traffic, wave velocity, and tidal currents. Supplemental Materials, Submitted in Accordance with Rule 4 of ASBCA Procedures, at Exhibit 9 (Supp. R.4 Materials, Ex.).

VHA's design also considered the buoyancy of the pipelines. Supp. R.4 Materials, at Ex. 6–7. Buoyancy, expressed in terms of "specific gravity," is the relationship between the weight of the pipe and the weight of the water displaced by the pipe. A pipeline may float during installation if too buoyant. The Board found that these POL pipelines would not float:

> VHA's buoyancy calculations showed that empty 8–inch and 10–inch steel pipes, with or without coating, had sufficient net buoyancy to prevent their floating. ... These figures were confirmed later as correct....

Decision, at 96,933. Therefore, the Board found that the various options to prevent flotation were not necessary for this contract. Decision, at 96,933–34.[2]

VHA also took core samples of the riverbed. These borings showed soft silt material on the river bottom. Accordingly, VHA recommended a ratio of one vertical to four horizontal (1:4) feet for the trench in the shallow areas and 1:3 in the river channel. Following this recommendation, the trench would have gradual sloping sides. The recommended trench would thus have been three times wider than it was deep in the channel. Decision, at 96,-934. These gradual slopes would prevent the trench from filling with silt before the pipe was in place. Supp. R.4 Materials, at Ex. 11, 12. These slope angles were a recommendation, not a contract requirement. Transcript of Proceedings before the ASBCA, Vol. 11, p. 147 (Tr. (vol/p.)). As mentioned earlier, plaintiff bore the risk and, therefore, could determine the slope of the trench.

Plaintiff constructed the trench with a slope ratio of 1:1 from the east end of the trench at Pier 20 to the western toe of the channel. Thus, plaintiff's trench had vertical sides in the channel. Plaintiff also based its bid on a ratio of 2:1 from the western toe through the Craney Island flats. Plaintiff expected very little natural siltation because a trench which was narrow at the top would allow less natural sedimentation to occur. Tr. at 12/27–58.[3]

According to the Board, the Navy expressed concern about plaintiff's proposal for steeper trench slopes than suggested by the design. Decision, at 96,934; Tr. at

---

**2.** To prevent flotation, a pipeline contractor has several options. The contractor may fill the pipelines with water, weight the pipelines with concrete collars, or backfill the trench over the pipelines.

The contract prohibited burying the pipes in the trench until completion of testing. Decision, at 96,928, quoting Section 20.4 of Contract. Thus, plaintiff did not have the option of backfilling the trench to confine the pipelines.

**3.** Plaintiff also expected little siltation because it had encountered little siltation when constructing an underwater pipeline in the adjacent Craney Island Creek. The Board found, however, that siltation is not uniform in the Norfolk Channel. Plaintiff encountered much more silt than expected. *Maitland Bros. Constr. Co.,* 86–3 BCA (CCH) (Decision), at ¶ 96,934.

14/180–84. The Navy expressed this concern to plaintiff's representatives in February and March 1978. Again, after September 15, 1978, the Navy expressed the same concern. Decision, at 96,934.

Plaintiff laid the first 1,000–foot section of the pipelines in the Pier 20 area at the end of June 1978. Plaintiff laid the second 1,000–foot section of pipeline on July 13, 1978. Plaintiff continued to excavate throughout the summer of 1978 and into January 1979.

Problems with contract performance began on September 15, 1978. On that date, the Corps of Engineers (COE) checked the trench depth with a fathometer. COE determined that the trench was not at the contract depth. Materials Submitted in Accordance with Rule 4 of ASBCA Procedures, at Exhibit 8 (R.4 Materials, Ex.). Instead, the trench was 10 to 15 feet above the required depth of 76½ feet. Decision, at 96,936.

Plaintiff contended that it had dredged the trench to the depth of 80 feet. Plaintiff blamed maintenance dredging in the shipping channel for the discrepancy. Tr. at 11/211, 14/27–29. During the third week of September 1978, in particular, COE's maintenance dredging operation particularly disrupted plaintiff's work. Decision, at 96,938. This maintenance dredging caused accumulation of sediment in the trench. *Id.* at 96,939.[4] After plaintiff's complaints, the channel dredging operation moved out of range of plaintiff's work. Decision, at 96,938. In response to plaintiff's complaints, the Navy agreed to keep a minimum of 500 feet clearance between the dredging of the shipping channel and plaintiff's trench. R. 4 Materials, at Ex. 14. The Board found that this other dredging work disrupted COE's September fathometer readings. Decision, at 96,936.[5]

Plaintiff decided to re-excavate the trench. Decision, at 96,939–40. The re-excavation in late September cleared the trench. Decision, at 96,940. To check its work, Maitland employed Robert Dutcher Sterling, a diver, to inspect the pipelines trench. Mr. Sterling's measurements of the pipelines began in the western flats and went down into the western toe of the channel. At that point, he could not continue because of the accumulated silt and mud. Tr. at 11/20, 37, 51. He performed no trench or pipeline depth measurements in the channel. Tr. at 11/50–51.

On October 12, 1978, COE performed another fathometer survey. The results again showed the trench was too shallow. Tr. at 14/50, 54–56. Therefore, the Navy hired Dive Scan, Inc. (Dive Scan) to perform a diver survey of the pipeline depth. The diver, Mr. Stockton W. Rouzie, attempted to locate the pipeline with a pneumofathometer. Dive Scan performed a second survey on November 30, 1978. Dive Scan probed for the pipes at six locations, but only located the pipeline at four of the checkpoints. At three of the four locations where Dive Scan actually found the pipes,

---

**4.** The parties hotly dispute the effect of the maintenance dredging. The Navy witnesses before the Board opined that the maintenance dredging could not have caused 10 to 15 feet of silt to accumulate in the trench. Transcript of Proceedings, ASBCA, Vol. 17, p. 197–98, Vol. 19, pp. 107, 109. (Tr. (vol/pg)).

Plaintiff relied on the expert opinion of Mr. L.A. Caccese. Mr. Caccese testified that the maintenance dredging caused shoaling in plaintiff's trench. He claimed that good dredging practice would not have allowed two dredging operations in the same vicinity. The Board resolved this dispute. ASBCA concluded:

As a result, additional quantities of silt were deposited to the bottom of the trench....

This conclusion is supported by the large quantity of silt—up to 15 to 20 feet deep—that appellant's clam dredge operator encountered at the bottom of the trench when he reexcavated the western portion of the trench prior to the pipelaying on 5 October 1978....
Decision, at 96,939.

**5.** Fathometers measure depth by sonic waves. The sonic waves reflect off the river bottom or solid objects in the water to produce a depth reading. Silt or sediment near the river bottom can reflect the sonic waves and thus give an inaccurate reading. The Board determined that the COE survey left a doubt about the actual depth of the trench.

the pipes were above the depth required by the contract. Decision, at 96,941.[6]

The Board found a discrepancy in the Dive Scan report. According to the report, the pipeline at location 4 was 14 feet below the pipeline at location 6. The Board determined that it was impossible that the pipes rose 14 feet between these locations. The Board thus did not find that the pipe was beneath contract depth at location No. 4. Decision, at 96,942. Rather, the Board suggested that Dive Scan actually missed the pipes at location 4 as it did at locations 3 and 5. *Id.*

After installing the pipelines, plaintiff asked to backfill the trench prior to the hydrostatic testing. Decision, at 96,942. This request departed from the contract. By letter dated November 9, 1978, the Navy denied Maitland's request. *Id.* at 96,943; Supp. R.4 Materials, at Ex. 36. The Navy stated that refraining from backfilling would facilitate any repairs to the pipelines if leakage should occur.

Maitland finished the pipelaying operation in January 1979. In March, Maitland completed the hydrostatic testing for both the 8–inch and 10–inch pipelines. The Board found that the record did not explain the three-month delay between the completion of the pipelines and testing. Decision, at 96,943.

Plaintiff employed American Marine Salvage, Inc. (American Marine), a diving firm, to perform an as-built survey of the pipelines. American Marine performed this survey between April 9 and April 24, 1979. Plaintiff forwarded the preliminary results of its as-built survey to the Navy on May 9, 1979. The findings showed that the pipelines were above the required depths. Decision, at 96,943.

The Navy then hired the Crofton Diving Corporation (Crofton) to check the pipelines. The results of the initial Crofton survey led to a full as-built survey by the Navy. Crofton conducted the survey from May 10 through August 5, 1979. The Crofton survey revealed that Maitland had excavated the trench to a greater depth than required:

> Based on this information, there is no doubt that appellant had excavated the trench to a greater depth than required. In the channel the depth of the trench ranged from 79 to 84 feet while the required depth was 76.5 feet.

Decision, at 96,945.[7] The pipes themselves, however, rested in sediment well above the depths specified by contract.

In a May 12, 1979 letter, plaintiff charged that the empty pipelines became buoyant in the wet fluid mud. Decision, at 96,946. Plaintiff suggested restraining the pipelines with weight bracelets. The Navy rejected this recommendation as unnecessary.

Plaintiff contended before the Board that various natural and environmental conditions, including ship traffic and currents, created vibrations in the pipelines. These

---

**6.** The Board recorded the results of Dive Scan's survey:

| Location | Remarks | Elevation |
|---|---|---|
| 1. 750–ft mark alongside Pier 20 | Pipe located in trench | –62.5 ft |
| 2. 80–100 ft beyond end of Pier 20 | One pipe located on northern bank of trench, straps apparently broken and pipes separated | –47.5 ft |
| 3. Eastern edge of channel | Pipe not located in trench | –79 ft |
| 4. ¼ across channel from east side | Pipe located in trench | –77.5 ft |
| 5. ¼ across channel from west side | Pipe *not* located in trench | –81 ft |
| 6. Western toe of channel, outside channel | Pipe located in trench | –63.5 ft |

Decision, at 96,941–42.

**7.** The Board found that the Crofton survey was the only complete as-built survey performed. Decision, at 96,945.

vibrations caused the pipes to rise in the sediment. The Navy countered that plaintiff's defective workmanship placed the pipelines above the contract depth. Both parties presented extensive evidence from outside experts.

Maitland secured the services of Dr. Mitty Plummer and his firm Transitek, Inc (TTI). Dr. Plummer was an expert in vibrations. Dr. Plummer conducted laboratory experiments to show that the pipes could float upward when intensely vibrating. After detailed consideration of Dr. Plummer's experiments, the Board determined:

> [W]e are unable to adopt the results and conclusions of Dr. Plummer's laboratory experiments. There are a number of reasons why, in our opinion, this conclusion cannot be considered valid for our purpose.
>
> First, the vibration levels used were in excess of those recorded on the pipelines.... These intense vibration levels created conditions similar to a mini-earthquake, not shown to have occurred at the project site.
>
> Second, the entire environment in which the model pipelines were placed was vibrated unlike the vibration that may have been present in the trench or at the river bottom.
>
> Third, the material (mud) used was not reconstituted to its natural water content....
>
> The suggested thixotropic properties of the soil samples, based not on Dr. Plummer's own testing but on a consultant's somewhat inconclusive report, is contradicted by other laboratory tests. Dr. Gould's analysis of the shear strength of various sediment samples indicates their relative insensitivity to vibrations at the levels recorded on the pipelines.

Decision, at 96,954.

The Navy consulted Mueser, Rutledge, Johnson and Desimore, a firm of engineers in foundations and subsurface soils. Dr. James P. Gould conducted subsurface soils testing. The Board gave considerable weight to Dr. Gould's testimony:

> We accordingly find Dr. Gould's analyses and results of soil testing well documented and supported. We accept these accordingly.

Decision, at 96,954.

The Board rejected Dr. Plummer's theory that vibration induced a thixotropic effect which caused the pipeline to float. Rather, the Board attributed slight upward movement of the pipeline to changes in soil density underneath the pipeline:

> This may also explain the higher elevation at which the pipelines were located by the as-built survey in the Craney Island flats. We accordingly find that the pipelines did move upward in the sediment after installation as a result of the increasing density of the sediment and not because of the thixotropic behavior of the trench sediment.

Decision at 96,956.

The Crofton survey showed that the pipelines moved upward "some six-tenth of a foot" between May 11, and June 30, 1979. Decision, at 96,946.[8] The Board attributed this slight upward shift to the accumulation of denser soils under the pipes. These soils may have nudged the pipelines upward.

The Board rejected Dr. Plummer's thixotropic flotation effect. Indeed, the Board had found earlier that the empty pipes were too heavy to float. Decision, at 96,-932–33. Vibrations, although theoretically capable of loosening soils and allowing a buoyant object to pass through, could not alter the specific gravity of the pipelines.

Dr. Stephen A. Alsup conducted vibration tests for the Navy. The Board compared Dr. Alsup's tests with Dr. Plummer's tests:

> [W]e are unable to accept Dr. Plummer's results....
>
> The main reason is that an earthquake of considerable force would be required to create such a vibration.... In this

---

**8.** The Crofton survey had a margin of error between 6 and 12 inches. Therefore, the six-tenth of a foot variance was within the tolerance of the Crofton survey. In sum, the pipelines may not have moved upward slightly at all. Rather, the perceived upward shift might have been a tolerable measurement variance. Decision, at 96,946.

respect Dr. Plummer's measurements did not differ significantly from those of Dr. Alsup.

We accept Dr. Alsup's measurements as more closely reflecting the vibrations present in the pipeline and its immediate surrounding sediment. Although perhaps less accurate, the OSS measurements also support Dr. Alsup's findings. Decision, at 96,953–54. Thus, ASBCA analyzed carefully the testimony of all the experts. The Board adopted and followed the presentations of the Navy's experts.

In August 1979, the Navy directed plaintiff to correct the pipeline. The Crofton survey had shown conclusively that the pipeline rested from 10 to 12 feet above required depth in many places. Plaintiff relaid the pipeline. The Navy accepted the job on December 22, 1980.

Plaintiff appealed to the contracting officer seeking the costs of relaying the pipeline. On October 26, 1979, the contracting officer denied these claims. Plaintiff timely appealed the claims to ASBCA.

The Board held many days of hearings on claims arising from Maitland's excavation project.[9] At length, ASBCA concluded:

> With respect to the trench we have found that despite the Government's arguments to the contrary, appellant did excavate the trench to the required design depth and in most areas several feet deeper (finding L.8). No further discussion of this aspect is necessary.
>
> It is also undisputed that the trench, particularly in the western part of the channel and on its western toe, filled in with silt and sediment both prior to and after the pipelaying. By May–June 1979 the trench was filled with silt and sediment to the depth of 15–20 feet; to a lesser extent in the eastern part of the channel and in the Craney Island flats.
>
> As shown by the as-built surveys, both by appellant and the Government, for the most part the pipelines were not at the bottom of the trench but were found in the silt, in many locations 10–15 feet

above the design grade level. The pipelines were also severely misaligned....

There is no dispute that appellant neither completed an as-built survey of the installed submarine pipelines nor had been able to show in the summer of 1979 that the pipelines had been installed at the proper depth. Thus there had been no compliance with the contract requirements.

Decision, at 96,957.

In sum, ASBCA determined that plaintiff excavated the trench to the contract depth. Plaintiff, however, did not lay the pipelines at that depth. Rather, between dredging of the trench and laying of the pipelines, the narrow trench became a "silt trap." Decision, at 96,934; Tr. at 12/29, 41, 16/174.[10] Siltation filled the trench and prevented compliance with the contract.

The Board considered and rejected plaintiff's argument that design defects caused these problems. Decision, at 96,957–60. The Board considered and rejected plaintiff's argument that the Navy hindered efforts to stabilize the pipelines. Decision, at 96,960–62.

On September 16, 1988, Maitland filed a complaint in the United States Claims Court seeking review of ASBCA's final decision. Plaintiff contends that the ASBCA decision and findings are not supported by substantial evidence. Defendant cross-moved for summary judgment.

## DISCUSSION

This action involves Maitland's claim of $740,000, for the expense of re-excavating the trench and reinstalling the pipelines. This court must decide whether substantial evidence supports the ASBCA decision. Both parties agree that Wunderlich Act principles apply to this case.

### Standard of Review

When reviewing Board actions under the Wunderlich Act, 41 U.S.C. § 321

9. The Board held 19 days of hearings on two other appeals related to this contract, but distinct from this issue. Decision, at 96,927.

10. The Board specifically stated that plaintiff "assumed the risk of whatever greater siltation may have resulted from that trench configuration." Decision, at 96,961.

(1982), this court performs an appellate function. *Vista Scientific Corp. v. United States*, 808 F.2d 50, 52 (Fed.Cir.1986). With respect to the Board's legal determinations, the Wunderlich Act permits this court to determine whether the Board's decisions are erroneous. *National Civil Ser. League v. United States*, 226 Ct.Cl. 478, 643 F.2d 768 (1981). With respect to the Board's factual findings, this court may determine whether the Board's actions are fraudulent, arbitrary, capricious, or unsupported by substantial evidence. *Id.*

Plaintiff does not contend that ASBCA acted fraudulently, arbitrarily, capriciously, or contrary to law. Plaintiff contends only that the Board's action was not supported by substantial evidence. The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *United States v. Turner Constr. Co.*, 827 F.2d 1554 (Fed. Cir.1987).

The United States Court of Appeals for the Federal Circuit has recently provided additional guidance on reviews for "substantial evidence":

> In order to determine whether the board's finding is supported by substantial evidence, it was necessary for the court to "canvas" the entire record, because the substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Exaggeration, inherent improbability, self-contradiction, omissions in a purportedly complete account, imprecision, and errors detract from the weight to be accorded the evidence upon which an administrative Board bases its decision.

*Spurlock v. Department of Justice*, 894 F.2d 1328, 1330 (1990). Thus, this court must determine whether "substantial evidence, i.e., such evidence as might convince a reasonable person ... support[s] the conclusion reached by the Board...." *Iconco v. United States*, 6 Cl.Ct. 149, 151 (1984), *aff'd*, 770 F.2d 179 (1985). In reaching its conclusion, this court canvassed the entire ASBCA record.

### *Pipelines Not Laid at Contract Depth*

■ ASBCA found that plaintiff dug the trench deep enough to satisfy the contract, but laid many sections of the pipelines at depths 10 to 15 feet above the contract requirements. Decision, at 96,957. In the interim between trench dredging and pipeline laying, the narrow trench acted as a silt trap. Silt filled and accumulated above the trench. Thus, according to the Board, the pipeline never reached contract depth when initially laid. Decision, at 96,957.

Substantial evidence supports these findings. The Board thoroughly analyzed all available evidence in reaching its findings. The Board correctly relied on the Crofton survey.[11] This survey took three months to complete. Crofton divers located and inspected the dual pipeline at 52 points between stations 60+27 in the Craney Island flats and 103+48 west of the bulkhead off Pier 20 during the period from May 10 to August 5, 1979. Tr. 15/210–11; R.4 Materials, at 79.

This survey showed that plaintiff had excavated the trench below the contract depth. In the channel, for instance, the depth of the trench ranged from 79 to 84 feet while the required depth was 76.5 feet. Decision, at 96,945. The survey also showed that, except for a few locations, the dual pipelines did not rest on the bottom of the trench, but in the silt and sediment 10 to 15 feet above the contractually required grade. Decision, at 96,946. Thus, the one complete "as-built" survey fully supports the Board's findings.

In support of its findings, however, the Board also reviewed other surveys. Even a survey commissioned by plaintiff corroborated the Crofton survey results and the Board's findings. American Marine's in-

---

**11.** As the Board explained, the Crofton survey was the only complete and the most reliable measurement of the trench and pipeline. Other surveys, though generally corroborating Crofton's results, were incomplete, or otherwise flawed. Decision, at 96,941–42, 96,957.

complete survey showed that the pipelines were not at the bottom of the trench. Rather, the survey verified that the pipelines rested on up to 20 feet of sediment.

In accordance with its full and fair review of all evidence, the Board found that Maitland had not laid the pipelines at the correct contract depths, and thus did not fulfill the contract requirements. Substantial evidence fully supported that factual determination.

Plaintiff contests ASBCA's finding. Plaintiff argues that it initially laid the pipelines at the bottom of the trench and deep enough to fulfill the contract. Then, according to plaintiff, special circumstances not anticipated by the Navy's design caused the pipelines to float upwards to the depths discovered in the Crofton survey. Thus, plaintiff blames the Navy's design defects for the pipeline's shallow resting place.

The Board gave thorough consideration to plaintiff's contentions. The factual record, however, disclosed the flaws in each component of plaintiff's argument.

The record does not show that plaintiff initially laid the pipeline at contract depth. Rather, as the Crofton and American Marine surveys show, plaintiff initially laid the pipelines too shallow. In an effort to show its essential premise, however, plaintiff seizes on a single measurement in the faulty Dive Scan survey.[12] At one location, the Dive Scan survey placed the pipeline beneath contract depth. The Board, however, discounted this single reading on the basis of a careful examination of the evi-

dence. In fact, the Dive Scan survey corroborated that the pipes were too shallow at three out of four locations where the survey actually located pipes. Decision, at 96,941.[13] Thus, the overall evidence in the Dive Scan survey also supports the Board's findings, not plaintiff's theory.

Plaintiff's next premise is that the pipelines moved upward after initial placement. Attempting to show this elevating effect, plaintiff vastly exaggerates the import of a single Board finding. ASBCA, when examining Dr. Gould's soil tests, stated:

This may also explain the higher elevation at which the pipelines were located by the as-built survey in the Craney Island flats. We accordingly find that the pipelines did move upward in the sediment after installation as a result of the increasing density of the sediment....

Decision, at 96,956. The upward movement recorded by the Crofton as-built survey amounted to movement of at most seven-tenths of a foot. Decision, at 96,946.[14] Neither the Crofton survey nor Dr. Gould's tests substantiated an upward movement in the magnitude of 10 to 15 feet. Specifically, the Gould Study concluded:

While the nature of the flotation problem of pipelines in soft sediments is not well-defined and needs further general and specific studies, our testing of slurries made from the sediment samples indicates that there is practically no chance of the pipes having been lifted from the contract level in the trench by flotation of the soft sediments. Because of the build-up of shear strength in the

---

12. The Board noted flaws in the Dive Scan survey. For instance, the locations measured were only approximate. Decision, at 96,942. The diver did not locate the pipes at all at two locations. *Id.* COE requested Dive Scan to redo its survey after its first report. *Id.* at 96,941.

13. The divers located the pipes at four out of six locations. Three of those locations measured the pipes at depths above the contract requirement. One measurement purportedly placed the pipes beneath contract depth. The Board stated:

[W]e cannot dismiss the possibility that he may have missed the pipes with the probe while working in the silt that had accumulated in the trench. It also does not seem proba-

ble that the pipe rose from the depth of –81 feet at location No. 5 some 17 feet over a distance of 400 feet to location No. 6. We are accordingly unable to make the finding, as appellant has urged, that the pipe was at least at the contract depth at location No. 5.

Decision, at 96,942.

14. The slight upward movement recorded by Crofton was actually within the margin of error for Crofton's survey. The margin of error was six to twelve inches. Decision, at 96,946. Thus, Crofton may not have recorded any upward movement. The Board, however, found that this slight upward movement did occur. Decision, at 96,955.

sediments as materials are deposited above them, there is only a relatively small range of depth in the sediments in which pipe movement would occur either upward or downward. The dominant tendency would be for these pipes to sink in the recent sediments.

Supp. R.4 Materials, at Ex. 55. Thus, although the Board found a slight upward shift due to changing soil density beneath the pipeline, the record does not show any reason to find that the pipes rose 10–15 feet.

Plaintiff's theory necessarily requires buoyant pipelines. The pipelines otherwise could not float. The Board found, however, that the pipes would not float upwards. Unrebutted buoyancy measurements contradicted plaintiff's theory.

Plaintiff nonetheless alleges that special circumstances caused flotation. Plaintiff contends that these circumstances included wave and current action, vibrations caused by ship traffic and other external forces, and extraordinary siltation due to COE's channel dredging project. The Board again exhaustively examined these circumstances. The evidentiary record overwhelmingly supports the Board's findings that these circumstances did not cause pipeline flotation.

Wave and current action do not cause flotation. The Board specifically found that river currents did not affect the pipeline's specific gravity:

> River currents are external forces that may move a pipeline but they do not affect the pipe's buoyancy....

Decision at 96,933.

Plaintiff presented Dr. Mitty Plummer [15] to substantiate the hypothesis that vibrations in the pipeline could lead to flotation. In laboratory experiments, Dr. Plummer attempted to simulate river conditions. In that laboratory environment, Dr. Plummer showed that the simulated pipes moved upward. Dr. Plummer concluded:

> [T]he cause of the pipeline floatation [and] movement was the response of the soil to vibration of the pipe and of the soil itself, to current[s], ship traffic, to cause a thixotropic transition which enabled the pipeline to move upward as though it was lying in a dense liquid rather than a solid material.

Tr. at 13/145.

For good reason, the Board discounted Dr. Plummer's results.[16] The magnitude of vibration necessary to produce upward movement in the laboratory was equivalent to a major earthquake near the Elizabeth River. Decision, at 96,952–53. The record contained no evidence of such major disturbances. Moreover, ASBCA found Dr. Stephen A. Alsup's competing vibration measurements more realistic. Decision, at 96,954. Further, Dr. Alsup expressed well reasoned concerns about the overall accuracy of Dr. Plummer's testing environment and equipment. Tr. at 17/59–61. ASBCA reasonably relied on Dr. Alsup's measurements. Dr. Alsup's tests were far short of the major earthquake simulated by Dr. Plummer. *See* Tr. at 13/177–79.

Plaintiff also argues that COE's channel dredging caused extraordinary siltation. This added siltation, according to plaintiff, contributed to the alleged flotation. During late September 1978, COE performed annual maintenance dredging in the Norfolk ship channel. Decision, at 96,938; Supp. R.4 Materials, at Ex. 29. The Board found that maintenance dredging deposited "additional quantities of silt" in plaintiff's trench. Decision, at 96,939. Plaintiff moved its dredging activities because of

---

**15.** The Board appropriately noted that Dr. Plummer lacked some qualifications for these underwater circumstances:

> Dr. Plummer is a recognized specialist in the area of in-situ impedance testing for dynamic qualification of nuclear power plant components.... However, he has no background or publications in soil mechanics or soil dynamics. Prior to performing the test-

ing for appellant, he had not tested a submarine hydrocarbon pipeline.

Decision, at 96,947.

**16.** The Board noted several criticisms of Dr. Plummer's methodology. For instance, Dr. Plummer's instruments were not adequately sensitive to vibration. Also, Dr. Plummer's laboratory did not duplicate actual river conditions. Decision, at 96,953–54.

the interference. Decision, at 96,938; R.4 Materials, at Ex. 14.

After this episode, plaintiff cleaned and re-excavated its trench. Decision, at 96,-939–40. Plaintiff corrected any residual effects from COE's maintenance drilling before laying the pipeline. The record therefore supports amply the Board's finding that enhanced sedimentation did not cause plaintiff to lay the pipelines too shallow. Indeed, none of the special circumstances would cause flotation. Moreover, the pipes were not buoyant enough to float.

In sum, the Board rejected plaintiff's theory. ASBCA did not cavalierly discard plaintiff's explanation, but carefully and completely considered these concepts. Indeed the record supports the Board's conclusions. Flotation did not cause the pipes' shallow placement, rather, plaintiff's trench trapped silt. The accumulation of sediment caused the shallow placement.

### Requests to Restrain Pipeline

Plaintiff contends that the Navy unreasonably denied requests to restrain the pipeline from floating. Because the record showed that the pipes did not float, the Board correctly determined that the Navy had no reason to weigh them down. Plaintiff's argument has no evidentiary basis.

Specifically plaintiff contends that the Navy denied requests to restrain the pipelines by backfilling. On October 20, 1978, Maitland formally requested to stabilize the pipelines by backfilling the trenches. R.4 Materials, at Ex. 24. The Navy denied this request. Instead the Navy insisted on compliance with the contract. The contract forbid backfilling before the as-built survey and the hydrostatic tests were complete. The Navy's position was reasonable. If the hydrostatic testing disclosed leaks, a covered pipeline would be more difficult to repair. Decision, at 96,961.

The Navy was also within its rights to insist on strict compliance with contract requirements. The Board acknowledged that if compliance with the contract was impossible the Government would bear the

consequences. Decision, at 96,961. However, the Board determined:

There is no showing that the pipelines could not have been laid at the design depth and the hydrostatic test performed upon them before the trench was backfilled as prescribed by the specifications.

Decision, at 96,961. The record showed no evidence of movement demanding restraints. The record supports the conclusion that the pipeline was secure.

To support its finding, the Board again reviewed VHA's designs for the pipelines. Under the specifications, backfilling over the pipelines would occur immediately after approved hydrostatic testing. Decision, at 96,928. Maitland, who was responsible for conducting these tests, did not perform these tests until three months after laying the pipelines. If plaintiff had reasonable cause to fear flotation of the pipelines, it would not have waited three months to perform the hydrostatic testing.

The record does not show that plaintiff requested backfilling to restrain the pipes. Rather plaintiff requested backfilling on December 13, 1977—long before commencement of work. Plaintiff routinely requested backfilling. However, plaintiff knew this request contravened specific contractual language. Thus, the Board appropriately found that the Navy had every right to deny backfilling.

Plaintiff also charges that the Navy wrongfully denied its request to fill the pipelines with water. Again, the record does not show that plaintiff requested to flood the pipelines in order to prevent movement. Decision, at 96,943. Rather plaintiff's request more reasonably appeared to be a request to begin hydrostatic testing. The parties did not discuss flooding as a means to restrain the pipelines. In the absence of a reason to restrain the pipelines or a request to do so by flooding, the Board properly approved the Navy's denial.

Finally, in a May 12, 1979 letter, Maitland requested use of concrete collars to keep the pipelines from floating. R.4 Ma-

terials, at Ex. 40.[17] The Board's review of the entire record led to the finding that plaintiff made no proposal for concrete collars until June or July 1979. By this time, the Crofton and American Marine surveys had located the pipelines above the contract depth. The record contained no evidence that the pipes were moving. Thus, the Board reasonably concluded that plaintiff had no reason to restrain the pipelines. The Navy's denial was entirely reasonable. Therefore, on the basis of this court's review of the evidence before the Board, substantial evidence supports ASBCA's decision. Plaintiff did not make timely requests or have sufficient reason to secure the pipelines.

### Expert Testimony

Plaintiff also questions whether the Board could properly give more weight to one set of experts over another. The Board relied upon the Navy's witness' testimony to the exclusion of Maitland's. Substantial evidence supported ASBCA's reliance.

In battles between experts, the fact finder and judge must choose between expert opinions and theories. *Burlington Northern, Inc. v. United States*, 676 F.2d 566, 577–78 (Ct.Cl.1982). This reviewing court must accept the Board's evaluation of conflicting conclusions of expert witnesses, unless the testimony is inherently improbable or discredited by uncontrovertible evidence. *Consolidate Molded Prods. Corps v. United States*, 600 F.2d 793, 797, 220 Ct.Cl. 594 (1979); *Tecon v. United States*, 188 Ct.Cl. 436, 411 F.2d 1271 (1969); *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 751 F.2d 1287 (D.C. Cir.1984).

Plaintiff's expert witness, Dr. Plummer, a vibrations expert, determined that vibrations and soil content caused the pipelines to float. The Navy's two expert witnesses, Dr. Gould and Dr. Alsup, contradicted Dr. Plummer's theory. The Board delved into the details of these presentations. The Board found:

On the record as a whole we [the Board] find their views [Dr. Gould and Dr. Alsup's] regarding the possible vibration effects on the pipeline more persuasive.

Decision, at 96,960.

The scrupulous scientific testing by the Navy's experts, as well as flaws in Dr. Plummer's analysis, support the Board's findings. *See, e.g.,* Supp. R.4 Materials, at Ex. 89. The Board therefore did not act unreasonably in its assessment of the expert witnesses. Substantial evidence again supports the Board's decision.

### Design Defects

Plaintiff asserts that a defect in the project design caused the shallow positioning of the pipes. Again the Board properly weighed and rejected this contention.

Plaintiff alleges that it installed the pipelines at contract depth only to have the pipes move upward later due to buoyancy and vibrations. Plaintiff alleges that the Navy's defective design caused the flotation.

The Board carefully reviewed VHA's design. VHA considered the conditions in the environment surrounding the pipelines. The Board found that VHA took into account the amount of ship traffic on the Elizabeth River, the velocity of waves and tidal currents. Supp. R.4 Materials, at 7–9. VHA determined that the pipes were not buoyant. The Navy corroborated this determination. The Navy's independent analysis and review of the pipeline design confirmed a negative pipeline buoyancy on both lines. Thus, the Board's finding is further supported by evidence such as an in-depth study into the necessary buoyancy level to keep the pipelines in place in the trench. R.4 Materials, at 5–6. VHA also

17. Plaintiff also mentioned concrete collars in a June 4, 1979 letter, but without making a formal proposal. Decision, at 96,944; Materials Submitted in Accordance with Rule 4 of ASBCA Procedures, at Exhibit 42 (R.4 Materials Ex.). Maitland contends that it made a proposal in June 1978. Maitland does not identify any contemporaneous documentation to support its position. Therefore, substantial evidence supports the Board's finding that plaintiff did not make this proposal until 1979. Decision, at 96,962.

took samples of the soil and sediment in determining the correct slopes on which the trench was to be dug, in order to keep the pipelines secure. R.4 Materials, at 2, 74.

The Board found that VHA's design was not defective:

> As to the dynamic forces such as currents and waves, we found no persuasive evidence of negligence or omission in the design effort....

Decision, at 96,958. Substantial evidence supports the Board's finding. The Board found that VHA's design was correct. The pipeline did not float. The Board stated:

> We accordingly find that the pipelines did move upward in the sediment after installation as a result of the increasing density of the sediment and not because of thixotropic behavior of the trench sediment.

Decision, at 96,956. This statement means the pipes did not float. The underlying sediment may have nudged the pipes upward, but the pipes did not float according to Dr. Plummer's thixotropic theories. VHA's buoyancy calculations were correct. The design was not defective.

In rendering its finding, under the persuasion of numerous documents and testimony by witnesses, the Board fulfilled the substantial evidence test in finding that the design of the pipelines was not defective. Therefore, on a basis of this court's review of the evidence before the Board, substantial evidence supports ASBCA's decision.

### CONCLUSION

Substantial evidence supports the ASBCA decision. The Board correctly examined the evidence, testimony, and contract specifications. The Board's findings and conclusions pass muster under Wunderlich Act standards.

Plaintiff has shown no basis on the record before this court to overturn ASBCA's findings that the pipelines were not laid at the depth required by contract, that the requests to restrain the pipelines were properly denied, that the design of the pipelines was not defective, and that the Navy's expert witnesses' testimony was entitled to more weight. Accordingly,

this court grants defendant's motion for summary judgment and denies plaintiff's motion for summary judgment. The Clerk of the Court is instructed to enter judgment dismissing the complaint.

No costs.